Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/01/2020 08:08 AM CST

Ashley R. Smith, appellee, v.
Gerald E. King, Jr., appellant.
___ N.W.2d ___

Filed November 24, 2020.    No. A-19-999.

1. **Child Custody: Appeal and Error.** An appellate court reviews child custody determinations de novo on the record, but the trial court's decision will normally be upheld absent an abuse of discretion.
2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3. **Contracts: Compromise and Settlement.** A settlement agreement is subject to the general principles of contract law.
4. ____: ____. To have a settlement agreement, there must be a definite offer and an unconditional acceptance.
5. **Child Support: Appeal and Error.** An appellate court reviews child support determinations de novo on the record, but the trial court's decision will be affirmed absent an abuse of discretion.
6. **Paternity: Attorney Fees: Appeal and Error.** An award of attorney fees in a paternity action is reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial judge. Absent such an abuse, the award will be affirmed.
7. **Paternity: Child Custody: Visitation: Moot Question.** Any issues regarding temporary custody and parenting time become moot upon entry of the decree of paternity establishing permanent custody and parenting time.
8. **Contracts: Parties: Intent.** To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract.
9. **Contracts: Parties.** A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties about the details of the proposed

agreement; it may be implied from the parties' conduct and the surrounding circumstances.

10. **Contracts: Parties: Intent.** The determination of the parties' intent to make a contract is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction.

11. **Contracts: Parties.** A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract.

12. **Compromise and Settlement.** An alleged oral compromise and settlement agreement not made in open court is unenforceable where it is in violation of the statute of frauds or in violation of a court rule requiring all stipulations and agreements of counsel or parties to a suit to be in writing, signed by the parties or their attorneys.

13. \_\_\_\_. A settlement agreement made in open court on the record, agreed to by all of the parties to the litigation and approved by the court, is enforceable.

14. **Attorney and Client: Compromise and Settlement.** Although lawyers retain apparent authority to make procedural and tactical decisions through the existence of the attorney-client relationship, a lawyer cannot settle a client's claim without express authority from the client.

15. \_\_\_\_: \_\_\_\_. Where there has been nothing beyond a mere employment or retainer of the lawyer to represent the client in a cause and the lawyer has acquired no other authority to enter into a settlement (such as acquiescence in open court), if the lawyer seeks to enter a settlement, the opposing party should ascertain whether the lawyer has received actual authority from the client to take such action.

16. **Attorney and Client: Compromise and Settlement: Appeal and Error.** Disputes over a lawyer's authority to settle are factual issues to be resolved by the trial court; however, an appellate court will not set aside a trial court's factual findings regarding settlement disputes unless such findings are clearly erroneous.

17. **Trial: Evidence: Appeal and Error.** The reopening of a case to receive additional evidence is a matter within the discretion of the district court and will not be disturbed on appeal in the absence of an abuse of that discretion.

18. **Trial: Time.** In a case tried to the court without a jury, a motion for specific findings of fact must be made before final submission of the case to the court.

19. **Child Custody.** When deciding custody issues, the court's paramount concern is the child's best interests.

20. **Child Support: Rules of the Supreme Court.** A trial court has the authority to order a parent to pay the categories of expenses specified in Neb. Rev. Stat. § 42-364.17 (Reissue 2016), in addition to the monthly child support obligation calculated under the guidelines.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed as modified.

Sandra Stern for appellant.

Chris Pomerleau, of Nebraska Legal Group, for appellee.

Moore, Chief Judge, and Bishop and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

Gerald E. King, Jr., appeals from the decree of paternity entered by the Douglas County District Court which granted Ashley R. Smith primary physical custody of their two children, subject to Gerald's parenting time of every other weekend and one evening on the "off" week. Gerald assigns numerous errors related to the temporary hearing and order, the amount of parenting time he received in the decree, and the award of attorney fees to Ashley. He also challenges the district court's decision to not grant his in forma pauperis (IFP) request for transcription of court hearings or, alternatively, to not order Ashley to pay for the same so that he could adequately prepare for his motion for new trial. We affirm as modified.

## II. BACKGROUND

Gerald and Ashley were in a relationship for a number of years, but never married. During the course of their relationship, they had two children: a son, Cipher King, born in 2005, and a daughter, Phoenix King, born in 2011. The parties ended their relationship in 2014 or 2015, and they proceeded for some time without court involvement regarding custody and child support. Ashley ultimately filed a complaint for establishment of paternity, custody, and support in 2017.

## 1. Initial Pleadings and Temporary Hearing and Order

On June 8, 2017, Ashley filed a complaint for establishment of paternity, custody, and support. She alleged that Gerald was the father of Cipher and Phoenix. Ashley sought sole legal and physical custody of the children, and she asked that child support be ordered in accordance with the Nebraska Child Support Guidelines. She also asked that Gerald be required to pay her attorney fees.

After a September 1, 2017, hearing on temporary matters at which Gerald appeared pro se and Ashley appeared with counsel, the district court entered an order on September 7. The court determined that Gerald was the children's father. Ashley was awarded temporary custody of the children; however, Gerald was awarded parenting time "every other weekend from [Friday] after school, or 3:00pm, whichever is earliest," through Sunday at 7 p.m., and he was also awarded the "'off' Thursday evening from after school, or 3:00pm, whichever is earliest through 8:00pm." Gerald was ordered to pay child support in the amount of $706 per month, beginning September 1. He was also ordered to pay 40 percent of any noncovered medical expenses after Ashley had paid the first $480 per calendar year on behalf of the child and 40 percent of any work- and education-related childcare expenses.

On March 8, 2018, Gerald, now with counsel, filed an answer and "cross-complaint" wherein he acknowledged his paternity and sought joint legal and physical custody of the children, with equal parenting time for the parties. He asked that child support be ordered in accordance with the Nebraska Child Support Guidelines. On March 30, Gerald filed a motion for temporary orders seeking equal parenting time pending trial. On June 6, he filed a motion asking the district court to set a trial date and to award him summer parenting time pending the trial. And on June 12, he filed a motion to amend the temporary child support order retroactive to September 1, 2017. According to the "Judges Notes" appearing in our

transcript, the district court denied any further temporary hearings pending trial.

On August 2, 2018, Ashley filed a contempt action against Gerald for failure to follow the September 2017 temporary order regarding parenting time and child support. The resolution of this action does not appear in our record.

## 2. Trial Begins

Trial began on September 28, 2018, and continued on October 1. Both parties appeared with counsel. Several witnesses testified, and numerous exhibits were received into evidence.

According to Ashley's testimony, she and Gerald were in a relationship on and off for 11 years. They stopped living together in October 2015, but Gerald believed it was 2014. Prior to when they stopped living together, Ashley was the primary caretaker for the children. She fed them, bathed them, helped them with their schoolwork, and provided the majority of their transportation. Ashley was also paying for all of the childcare costs and children's activities. However, according to Gerald's testimony, they shared parenting and household duties and he also paid for household expenses; he even stated that when Phoenix was born, he was the primary caretaker because he was not working at the time.

After the parties stopped living together, Ashley and the children moved in with her mother, where they have remained. Gerald stayed with a friend for a few months. Ashley stated Gerald would "just call" and ask to see the children, and "[i]t would just be kind of sporadic." However, according to Gerald, he saw the children "daily" while staying with his friend, but he did not keep them overnight. After staying with his friend, Gerald lived in a few different places. For the first few months, Gerald had the children every weekend. Then the parties tried alternating parenting time on a daily basis, but that did not last very long. Then, beginning in February 2017, the parties alternated parenting time on a weekly basis. Ashley testified that she "never had a say in [their] arrangements"

during the alternating daily or weekly parenting time. Ashley filed the paternity action in June, and the temporary custody and parenting time schedule was put into place in September, wherein Ashley got primary physical custody and Gerald had parenting time every other weekend and every other Thursday. However, Gerald would occasionally keep the children beyond his parenting time without Ashley's agreement; Ashley called the police two times and was able to get them. Gerald had also picked the children up from school on a day he did not have parenting time.

Exhibit 8 contains text messages between Gerald and Ashley. We include a sampling of those text messages here, including all typographical and grammatical errors. On September 11, 2017 (year based on Ashley's testimony), Gerald and Ashley texted:

[Ashley:] . . . [I]t is not your day. If I need to get the police involved I will

I will be picking cipher up when I leave here at 3.

[Gerald:] You can spend ya day all mad cuz I got him and flip but that's on you me and cipher is gonna have a good time keep ya bad vibes to yaself

[Ashley:] It's done.

You did this

[Gerald:] Call the cops now then save some time I welcome you doing that while I'm with him lol

Cops cops cops

You think you can scare me with cops lol lol lol

[Ashley:] I am not trying to scare anyone, but this is exactly why I went to court so when you do this BS I have a leg to stand on

I will be there to get cipher at 3

. . . .

[Gerald:] Bitch this is my son fuck whatever you on

If I was hurting him or mistreating him or had him in danger then cool but flipping the fuck out cuz I'm simple with im yea go fuck ya self

. . . .

> You are a female that younger than me you have no power or authority over me I am sorry we didn't work but you don't get to decide when I see my kids cuz we didn't[.]

On September 12, Gerald texted, "I got one son and one daughter in this world that I helped create and bring into this world there's no stranger thatbdont know me or my kids gonna dictate what I can and can't do with them." In October, the parties were arguing about parenting time and transportation and Gerald texted:

> You ain't sacrificing shit it should be week to week this bullshit you on where you think you have the only right to OUR kids and how to raise them I don't give two shits about a lawyer Judge or court none of them was involved in us making these kids and you can have them pump ya head but the real is you on bullshit[.]

On October 11, the parties were again arguing over the parenting time schedule, and Ashley texted Gerald saying, "All of this is reported back to a judge." Gerald replied:

> Haha report I don't give a fuck either
>
> . . . .
>
> Report fuck the judge
> Report fuck ya lawyer
> Report fuck them all
> Report when my schedule change none of this every other week shit will apply
> Report these are my kids and they have zero authority over me
> Report how much of a bitch you are[.]

During his testimony, Gerald said he sent the text messages because he was upset about the situation and wanted to spend more time with his children.

Gerald agreed that he would follow court orders. However, he acknowledged that he had kept the children longer than his parenting time and that he had picked them up from school when it was not his day. Also, between September 1, 2017,

and June 2018, he paid a total of only around $1,050 in court-ordered child support. He said, "I had a house, kids, rent and stuff that was due. So I financially could not . . . ." He stated he also paid some money directly to the court after June 2018. (According to a Department of Health and Human Services payment history report, between June 26 and September 14, Gerald had paid $1,200; he never once paid his full monthly obligation.) Gerald acknowledged that he had not paid for any childcare; he said he did not know that child support and childcare were different. Gerald admitted receiving receipts for Phoenix's childcare costs, but he denied receiving receipts for Cipher's childcare costs.

According to Ashley, Gerald had been physical with her on "multiple occasions." Ashley said there had been "slaps to the face," most recently 3 years ago, and "hair pulling," most recently when she was 8 months pregnant with their daughter. According to Ashley, both children had witnessed incidents when Gerald was physical with her. Gerald had also called her names, like "bitch," in front of the children. According to Gerald, there was "a lot of lies and embellishment" in Ashley's testimony. He acknowledged that their relationship was not appropriate, and he confirmed that Ashley hit him multiple times.

Ashley said she witnessed an incident when Gerald was "aggressive" and grabbed Phoenix's arm when she tried to go to Ashley. And Cipher was crying and upset when he called and told her that Gerald "struck him for letting the dog out."

Ashley was also aware that Gerald smoked marijuana around the children; "this Sunday" Ashley picked Cipher up from Gerald's house and "had to roll down the windows because [Cipher] reeked so heavily of marijuana." Gerald testified that he was charged with possession of marijuana twice and confirmed he was convicted of possession of marijuana, but he did not specify whether it was once or twice. Ashley acknowledged that she had smoked marijuana in the past, the last time being 4 to 5 years ago, and that at that time, she had smoked it in front of the children. Ashley also acknowledged she was

convicted of "DUI" 5 years ago, but said the children were not in the car at the time. Gerald testified that he has seen Ashley drive with the children after she had been drinking.

Ashley's mother, with whom Ashley and the children have lived for 4 or 5 years, testified that Ashley is an "amazing" parent and is "an absolutely wonderful role model." The children are "extremely well-behaved." As to Gerald's temperament, Ashley's mother said, "Numerous times I've heard him on the other end of a phone call conversation with Ashley knowing that the children were within earshot, and I could overhear such profanity and degrading language used to my daughter."

Ashley testified that she was asking for sole legal and physical custody. Ashley preferred that Gerald not have parenting time on school nights because he did not have reliable transportation. She stated that when she was out of town for a week, their son was tardy three times. Additionally, it was important to Ashley that the children have consistency on school nights.

However, Gerald said that "[t]here's no concern" with him being able to get the children to school on time. He claimed it was Ashley or her mother who took the children to school late and caused them to be tardy three times during the current school year. Gerald wanted to have parenting time on an alternating weekly basis, like he had prior to the September 2017 temporary order. He thought it would be "fair" for both parents to have half of the time with the children because "there [were] no problems prior," "no issues." If the court was not inclined to give him equal parenting time, Gerald's alternative proposal was for 6 out of every 14 nights—every other week from Friday at 8 a.m. to Wednesday at 8 a.m., and then overnight on the Tuesday of his "off week" (Tuesday at 8 a.m. to Wednesday at 8 p.m.). He also wanted parenting time on half of all school holidays and half of the summer.

Gerald testified that he told Cipher what happened at court at the temporary hearing "[b]ecause his mother lies to him"; "before anything ever started," she told Cipher everything was

going to stay the same. Gerald showed Cipher the affidavits that Ashley and her mother presented to the court at the temporary hearing against Gerald. Text messages between Gerald and Ashley were received into evidence and reveal the following: Ashley texted Gerald, "Why would you bother cipher with our issues while he is at school, . . . [h]e is not your friend or your support - he is your child and he did not have to find out what is going on via text." Gerald responded:

> He wanted to know what happened so I told him I let him read what you and ya mom said about me on the affidavit and all he should know the truth not the sugar coated lies you and ya momma tell him
>
> So when I'm. It around and he can't come here for a week it because of you not me you did this all[.]

Ashley replied, "[M]y affidavit is true."

Gerald told the children they would be testifying at trial. "What I told them is you guys need to tell the truth and this is your opportunity to express to the judge what you want. I don't know what you want." He said, "I did promise them that if I had more time with them then I can take more trips with them because they want to go places. And I express to them I don't currently have the time to take them . . . ."

The district court recessed for lunch on October 1, 2018, but never came back on the record that day. However, as revealed through subsequent motions and hearings, it appears that the district court met with the parties' counsel in chambers after the lunch recess on October 1. The "Judges Notes" for October 2 appear in our transcript and state: "Matter came up for Trial, [named counsel] appeared as counsel of record. [Gerald's counsel] to prepare a Decree." The next action that appears in our record is a motion filed on October 5.

### 3. MOTIONS AND HEARING

On October 5, 2018, Ashley filed a motion asking the district court to reconsider and amend its findings from the trial held on September 28 and October 1, to enlarge the record

to allow rebuttal witnesses and closing statements, to clarify the decision of the court, and to order a new trial.

The district court and the parties' counsel apparently met again in November 2018, but such proceedings do not appear in our record. However, the "Judges Notes" for November 16 appear in our transcript and state: "Matter came up for Motion to Clarify. Trial continued to 1/23/19 at 10a.m." On November 28, Gerald filed a motion for entry of decree. He alleged that after trial was held on September 28 and October 1, his counsel was instructed to prepare a decree; his counsel forwarded a proposed decree and parenting plan to Ashley's counsel on October 2; and Ashley filed a motion for clarification as to certain terms of the decree, which was heard before the court on November 16, and certain matters were clarified. Gerald alleged that the decree attached to his motion reflected the nature of the proceedings as well as the court's findings and orders, with the exception that Gerald added a paragraph providing that both parties shall be awarded 7 days parenting time of their choosing each year, to accommodate for special events that each parent may want to spend with the children.

On November 29, 2018, Ashley again filed a motion asking the district court to reconsider and amend its findings from the trial held on September 28 and October 1, to enlarge the record to allow rebuttal witnesses and closing statements, to clarify the decision of the court, and to order a new trial. Gerald filed an objection to Ashley's motion.

At a hearing on December 4, 2018, the parties appeared on the foregoing motions. At this hearing, the district court stated, "I know we had a hearing in my office on October — I don't know if it was October 5th or after that . . . ." Ashley's counsel then stated, "[W]e came here [in November,] and the Court made a decision that we would schedule a two-hour opportunity for us in January [2019] to finish the testimony, not only of my client, but also of [Gerald] and allow the parties to submit their closing arguments." Ashley's counsel further stated, "So regarding [Gerald's] motion to enter the decree,"

Ashley would object because the case has not been closed. The court stated:

> Well, let's be clear. We had trial and you — the trial was not completed. We took a break. We had to get another date. I told both of you what I thought would be appropriate based on the evidence that I've heard. You both then said okay. We'll try to put together a decree. That was not on the record. And since then we've had another hearing in which you've disagreed as to what the two of you thought you had agreed to which the Court was going [sic] propose. I think that this is — I don't think either one of you is correct a hundred percent. And apparently you feel like [Gerald's counsel] is continuing to add things that your client was not willing to agree to. I think we'll just finish the trial in January.

Gerald's counsel objected to "re-opening this matter." The following colloquy then took place.

> [Gerald's counsel:] You're right. We had a two-day trial. I had witnesses. [Ashley's counsel] had witnesses. We had continued into the second day . . . . We had one more day slotted for that trial, and I had a couple witnesses and I was going to ask you to speak to the minor children. You told us at the beginning of the trial that you would if you deemed it to be necessary. So it wasn't a hundred percent. It wasn't a given. We proceeded through lunch. You called us back to your chambers and you said, Here's what I am inclined to do.
>
> THE COURT: I said basically here's what I'm thinking based on what I heard.
>
> [Gerald's counsel:] Right. And based on that, I represented to the Court, we're fine with that, Your Honor. We will not present anymore witnesses. We rested. There was no request by [Ashley's counsel] to put on additional witnesses, to present a rebuttal, to present a closing argument. In fact, [Ashley's counsel] asked for clarification on certain things that you ordered. You were very specific in your orders. . . . You advised me [to] prepare

the decree. You ordered six days out of . . . 14 to [Gerald], eight days out of 14 to [Ashley]. You ordered joint custody — joint physical custody, sole legal custody to [Ashley]. You said whatever the guidelines say the guidelines say with regard to child support. . . . [T]here was a specific question about attorney's fees. You said yes, anything related to the contempt matter. There was a specific question . . . about how much [Gerald] should pay towards arrears, and you said $300 a month, which I interpreted to be total arrears for child care and child support, and we have a disagreement on what you intended. . . . I think my decree that's submitted is 100 percent what you ordered, but for that paragraph. You said the parenting plan that the parties mediated. You said 50 percent of the summer. *Those were all things that Your Honor stated in chambers. There wasn't a court reporter.* . . . The only arguable thing [we] didn't do was closing, and [Ashley's counsel] didn't ask for it. And I highly doubt that his closing will change Your Honor's opinion. . . .

. . . .

THE COURT: . . . . The issue is, you haven't rested on the record. [Ashley's counsel] wants more time. He doesn't agree. And so I don't think I can force the — we didn't — we should have brought the parties out and entered the terms of that on the record, and then it would have been done. We didn't do that.

. . . .

THE COURT: . . . . I'm just saying because it wasn't completed in the proper way — and I'm taking responsibility for part of that — I think we have to finish the trial if [Ashley's counsel] isn't happy with it. I don't think we have any other choice. I don't think I can force the entry of this decree because we didn't bring the parties out and put it on the record. And that's on me.

. . . .

THE COURT: . . . . I mean, the bottom line is, when we had our conversation, I told you that based on what

I had heard because it was so close to being at the end, this is what I thought would likely happen. At that point in time, I don't recall strong-arming anybody into saying this is what it should be, and *I believe a settlement was reached. But because that wasn't memorialized, because we didn't come back out in the courtroom and put in on the record at that time, I don't believe it's enforceable by the Court.* I think you get a chance to finish, if that's what you want.

[Ashley's counsel:] It is what I want, Your Honor. And I also don't want there to be a confusion about — it's truly unfortunate that anybody that day thought there was a settlement.

THE COURT: You said yes, I believe the case can be resolved because I told you what you [sic] thought was happening. You were in my office. It wasn't on the record. I understand that.

. . . .

[Ashley's counsel:] And in no way was [sic] speaking for my client agreeing to a settlement of —

THE COURT: That's why I'm not entering the decree.

(Emphasis supplied.)

### 4. Trial Resumes

Trial resumed on January 23, 2019. Gerald rested his case, with the exception that he still wanted the district court to speak to the children: "If after the case in chief you feel like you are not going to give [Gerald] at least six days out of 14, I would continue to ask you to speak with the children[,] [b]ut I will rest my case . . . ." Ashley's counsel called Gerald to the stand.

Gerald acknowledged that he and Ashley have had altercations and that he has pushed her to the ground, but he claimed he pushed her in self-defense after she grabbed him by the hair and "pulled out a couple of [his] dreads." He denied that the children witnessed the pushing incident, which he believed occurred in 2009, and he stated he had not been physical

with Ashley in "over seven, eight, nine years." He also said he tries to refrain from having arguments with her via text message.

Gerald testified that in September 2018, right before trial, he gave Cipher tickets to a professional football game in Kansas City, Missouri, for his birthday; the game was on October 28. The game was during Ashley's weekend with the children, and although she said that Cipher could go, she "didn't really specify how that was going to happen, which is what [Gerald] was trying to accomplish for months." Because the game was at noon, Gerald wanted to pick Cipher up and drive to Kansas City the day before; Ashley said he could pick Cipher up the day of the game. When he arrived to pick Cipher up the day before the game, Ashley told Cipher that she would take him to the game, but "[Cipher] continued to proceed with me to my car. I didn't force anything." Gerald acknowledged that text messages received into evidence show his frustration with Ashley for changing her mind about letting Cipher go to the game.

We include a portion of those text messages here, including all typographical and grammatical errors:

> [Ashley:] And it's my weekend, my choice.
>
> If I said no he could not go you would have to accept that, but I am saying he can go Sunday morning drive two and a half hours to KC and be there by the 12 kickoff
>
> They are not leaving Saturday. Period
>
> [Gerald:] Watch us
>
> . . . .
>
> [Ashley:] It's Sunday or nothing.
>
> . . . .
>
> [Gerald:] Sunday is not an option is the best way I can put it to
>
> I don't care about the consequences will leave a Saturday[.]

Gerald testified that he was frustrated that Ashley refused to work with him on their parenting schedule to accommodate

the trip. There was some testimony about his understanding of the parties' parenting agreement following the second day of trial on October 1, 2018. We include the relevant exchanges here, although not necessarily in the order they occurred. Gerald's counsel asked, "We had trial on September 28th and October 1st of 2018?" And Gerald responded, "Correct." Gerald's counsel further asked, "And we started a new parenting time schedule; is that correct?" Gerald again responded, "Correct." Gerald's counsel also asked him, "And the last court hearing that we had, the Court awarded you, your understanding was, six out of 14 days?" Gerald replied, "Correct." During another exchange, the following colloquy was had:

> [Gerald's counsel:] The last day of trial when the Court ordered that you would have this much time, you're [sic] schedule wasn't —
>
> [Ashley's counsel:] Well, objection, Your Honor. That misstates facts not in evidence. The Court never ordered anything.
>
> [Gerald:] No. When the new order was put in, no.
>
> [Gerald's counsel:] Let's stop for a moment. Your Honor, I just want to . . . clarify for the record what the last — the previous day of trial was. I think I have it in the proposed decree, if I can look at that. October 1st.

Gerald testified that he had given Cipher the football tickets as a birthday gift earlier in September, prior to trial. There was then discussion about Gerald's plans to take Cipher to Kansas City a day earlier than Ashley desired:

> [Gerald's counsel:] Okay. And there was really no Court order at that point, was there?
>
> [Gerald:] Not really. I mean, it was still confusing to me to understand what the Court order was, and I just figured we could be amicable, me and her, about the situation. She just refused to work with me.

Gerald's counsel asked, "You were going to start your week on/week off on a different weekend, but [Ashley] told you no specifically?" Gerald responded, "Correct. I tried to do that so we wouldn't have this issue, but she made it so we would."

During Ashley's testimony, she said that when Gerald first bought the football tickets, he did not ask to purchase tickets for a game during her parenting time weekend. It was not until after Gerald gave the tickets to Cipher that Ashley realized the game fell on her weekend. "And then we went to court, and with the new arrangement, it wasn't anything against Gerald," but Ashley and the children had other plans that weekend; "it wasn't intentional that I was trying to keep him away from [Cipher] on this weekend." Ashley stated, "I have the same weekends I had before our October 1st order was put in."

Gerald testified that he took Cipher to the game and that he gave Ashley makeup parenting time the next weekend during his scheduled parenting time. Gerald said that prior to the game, he tried to work it out with Ashley "so we wouldn't have this issue, but she made it so we would. . . . She knew we would come back here. This was all plotted." He further stated, "I know she did it purposely. I've been with this woman for 11 years. I know her." Ashley testified that she agreed Gerald could pick up Cipher the day of the game, and there was no reason they needed to leave the day before, but that is what happened.

Gerald was also confronted with text messages he sent to Ashley in November 2017 wherein he used profanity, called her names, and told her to "Go suck a AIDS dick." Again, Gerald testified that he was just upset at the time he sent the text messages.

Gerald testified that he was still seeking "50/50" custody and parenting time. Gerald's counsel asked, "[Y]our understanding was the Court gave you six out of 14 days" after the first 2 days of trial, and Gerald responded, "Correct." But his "preference" was still 7 out of 14 days. It was also Gerald's understanding that Ashley would owe him child support under an "8/6" parenting time schedule.

A witness testified that she had seen Gerald and Ashley argue more than once in the past year, most recently on Christmas 2018. On Christmas, Gerald and Ashley were both at her house and, according to the witness, Gerald was

yelling at Ashley, "Ash, why the fuck you keep taking me through this. I'm tired of going through this shit with you with the kids back and forth to court." The witness said Ashley replied that it was Christmas and that they did not need to be arguing. The witness also confirmed that she had observed Gerald smoke marijuana around his children within the past 2 years. The witness had observed Ashley smoke marijuana around the children in the past, but not in the last 4 years.

After Ashley rested her case, counsel proceeded to closing arguments.

## 5. District Court's Decree

The district court's decree of paternity was filed on May 8, 2019. The court ordered that Gerald was the children's father. Pursuant to the decree and the attached parenting plan, Ashley was awarded sole legal custody and primary physical custody of the children. Gerald was awarded parenting time every other weekend from Friday at 4 p.m. until Monday at 8 a.m. and every other Thursday from 4 to 7 p.m. (before the weekend in which he does not have parenting time). Each parent was to have 2 weeks of uninterrupted parenting time during the summer. A holiday parenting time schedule was also established.

Gerald was ordered to pay child support in the amount of $665 per month for the two children, beginning February 1, 2019. He was also ordered to pay 38 percent of any noncovered medical expenses after Ashley had paid the first $480 annually per child and 38 percent of any work-related childcare expenses. All childcare expenses that accrued during the temporary order were preserved. The court noted that Gerald had paid $1,050 as partial payment toward childcare amounts due and owing under the temporary order, but as of May 1, 2019, still owed $2,612.40 in childcare arrearages; the court ordered him to pay $200 per month toward those arrearages. The order stated, "The parties shall each purchase the children clothing in an approximately equal amount." And Gerald was ordered to pay $2,885 of Ashley's attorney fees within

30 days of the decree "due to his inability to follow the temporary order regarding parenting time, child support obligations, and child care obligations and the legal fees incurred by [Ashley] due to same."

### 6. POSTDECREE MOTIONS, HEARINGS, AND RULINGS

On May 15, 2019, a "Defendant's Motion to Reconsider, Motion to Alter or Amend, Motion for New Trial" (motion to reconsider) was filed by Gerald. On June 6, Gerald filed a motion requesting the district court to "enter an IFP Order allowing him to receive a transcription of the proceedings or an order for [Ashley] to pay for transcription of these proceedings" prior to hearing and argument on his motion to reconsider. On June 28, the district court denied Gerald's motion for a transcription of the proceedings; Gerald appealed that decision, and on August 5, Gerald's interlocutory appeal in case No. A-19-695 was dismissed by this court for lack of jurisdiction.

A hearing on Gerald's motion to reconsider was held on September 18, 2019. During the hearing, Gerald's counsel repeatedly contended that the district court should have spoken to the children prior to entering its decree. Counsel stated, "[W]hen we rested [at trial], for the record, we said we're rested conditioned on six out of 14 days. If Your Honor is not going to order that, please set it for further hearing and speak with the children." The court responded by stating that because it did not grant Gerald's request, it was overruled. Counsel replied, "Okay. I did not have an opportunity to make an offer of proof because I did not know that you were going to overrule it." Counsel continued:

> I would have made an offer of proof as to what the children would testify to had I known that you were not going to order six out of 14 days and you had no intention of speaking with the children. I would have made an offer of proof and, I'll do that today.

According to counsel, "[I]f Phoenix and Cipher were called to testify in chambers with no parents present and just the attorneys and Your Honor, that Cipher and Phoenix would say that they love their father." Counsel continued:

> [Not having] six out of 14 days is traumatizing to them. The testimony that mom portrayed dad to be not keeping a house, not feeding them [nutritious meals], is inaccurate. That he was more than loving. He's always put their needs ahead of his own. And that it's extremely important for them to have quality time with their father. That would be the offer of proof . . . .

Gerald's counsel also challenged the amount of parenting time awarded to Gerald and the way child support was ordered. Additionally, counsel stated, "I realize that this [is] a motion for new trial, but [Gerald] would like specific findings of fact pursuant to [Neb. Rev. Stat. §] 25-1127 [(Reissue 2016)]."

Pursuant to its order filed on September 26, 2019, and its order nunc pro tunc filed on October 3, the district court denied the entirety of Gerald's motion to reconsider, "with the exception of the following, which has been stipulated to by the Parties." Gerald's child support obligation under the temporary order was amended as follows:

> From the time period of September 1, 2017 through May 1, 2019, Gerald owes a total of $7,986.00. Said amount is calculated based upon the following:
>
> i. From September 1, 2017 through September 30, 2018, [Gerald's] child support obligation to [Ashley] is in the amount of $650.00 per month.
>
> ii. From October 1, 2018 through May 1, 2019, [Ashley's] child support obligation to [Gerald] is in the amount of $58.00 per month.
>
> iii. This Order does not obligate [Ashley] to any past or current child support obligation. The purpose of the description of subparagraphs i,ii, and iii is solely to explain the computation of [Gerald's] Child Support Obligation from September 1, 2017 through May 1, 2019.

Commencing May 1, 2019, Gerald's child support obligation "shall adhere to the Decree of Paternity dated May 8, 2019."

### 7. Appeal

Gerald now appeals the paternity decree filed on May 8, 2019, and the October 3 order nunc pro tunc denying his motion for reconsideration.

## III. ASSIGNMENTS OF ERROR

Gerald assigns, summarized and reordered, that the district court erred (1) in various ways at the temporary hearing and in the temporary order; (2) by not enforcing the settlement of the parties that was reached in the presence of the trial court; (3) by not allowing the children to testify; (4) by not granting his request for specific findings of fact; (5) by not awarding him more parenting time; (6) by ordering him to purchase approximately one-half of the children's clothing; (7) by ordering him to pay a portion of Ashley's attorney fees; and (8) by not granting his IFP request for transcription of proceedings or, alternatively, in not ordering Ashley to pay for the same so that he could prepare for his motion for reconsideration.

## IV. STANDARD OF REVIEW

[1,2] An appellate court reviews child custody determinations de novo on the record, but the trial court's decision will normally be upheld absent an abuse of discretion. *Randy S. v. Nicolette G.*, 302 Neb. 465, 924 N.W.2d 48 (2019). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

[3,4] A settlement agreement is subject to the general principles of contract law. *Strategic Staff Mgmt. v. Roseland*, 260 Neb. 682, 619 N.W.2d 230 (2000). To have a settlement agreement, there must be a definite offer and an unconditional acceptance. *Id.*

[5] An appellate court reviews child support determinations de novo on the record, but the trial court's decision will be

affirmed absent an abuse of discretion. See *State on behalf of Martinez v. Martinez-Ibarra*, 281 Neb. 547, 797 N.W.2d 222 (2011).

[6] An award of attorney fees in a paternity action is reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial judge. Absent such an abuse, the award will be affirmed. *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999).

## V. ANALYSIS

### 1. STATUTE OF LIMITATIONS

Due to the gap in time between the children's births (2005 and 2011) and the filing of Ashley's complaint in this matter (2017), we initially note that the procedure for obtaining a determination of paternity is set forth in Neb. Rev. Stat. §§ 43-1401 to 43-1418 (Reissue 2016 & Cum. Supp. 2018). Section 43-1411 provides that a paternity action may be instituted "by (1) the mother or the alleged father of such child, either during pregnancy or within four years after the child's birth . . . or (2) the guardian or next friend of such child or the state, either during pregnancy or within eighteen years after the child's birth." Paternity can also be established by a notarized acknowledgment of paternity. See, § 43-1409 (signing of notarized acknowledgment, whether under § 43-1408.01 or otherwise, by alleged father creates a rebuttable presumption of paternity as against alleged father); § 43-1408.01 (during period immediately before or after in-hospital birth of child whose mother not married, person in charge of hospital or designated representative shall provide mother and alleged father documents and written instructions to complete notarized acknowledgment of paternity; acknowledgment, if signed by both parties and notarized, shall be filed with Department of Health and Human Services at same time as certificate of live birth); *Benjamin M. v. Jeri S.*, 307 Neb. 733, ___ N.W.2d ___ (2020) (proper legal effect of signed, notarized acknowledgment of paternity is finding that individual who signed

as father is in fact legal father; establishment of paternity by properly executed acknowledgment is equivalent of establishment of paternity by judicial proceeding); *Tyler F. v. Sara P.*, 306 Neb. 397, 945 N.W.2d 502 (2020) (same).

A notarized acknowledgment of paternity does not appear in the record before us. Furthermore, Ashley's complaint and Gerald's counterclaim were filed in the parties' individual capacities and were filed outside of the 4-year statute of limitations set forth in § 43-1411. However, Gerald did not raise a statute of limitations defense to Ashley's complaint, and instead, he acknowledged his paternity of the children. The statute of limitations is an affirmative defense which is waived if not asserted. See *Benjamin M. v. Jeri S., supra* (statute of limitations does not operate by its own force as bar, but, rather, operates as defense to be pleaded by party relying upon it and is waived if not pleaded). See, also, *Manker v. Manker*, 263 Neb. 944, 644 N.W.2d 522 (2002). In *Manker*, a father argued that the mother of their child was barred from bringing a paternity action more than 4 years after the child's birth, as set forth in § 43-1411. However, the Nebraska Supreme Court stated that "[t]he statute of limitations is an affirmative defense which is waived if not asserted by demurrer or answer." *Manker v. Manker*, 263 Neb. at 952, 644 N.W.2d at 531. The Supreme Court pointed out that the father had acknowledged paternity and his obligation to pay support in his answer, and such an affirmative allegation was "a judicial admission which constitutes a waiver of all controversy with respect to those issues." *Id*. at 953, 644 N.W.2d at 531. As such, the Supreme Court found no error in the district court's determination that the claims were not time barred.

In this case, both parties acknowledged that Gerald is the father of Cipher and Phoenix, and both parties sought a determination of paternity, custody, and child support. Therefore, as in *Manker v. Manker, supra*, we find such acknowledgments to constitute a waiver of all controversy with respect to these issues and conclude that the claims are not time barred.

## 2. Temporary Hearing
### and Order

[7] Gerald contends that the district court erred in various ways at the temporary hearing and in the temporary order and that such errors resulted in his not receiving a sufficient amount of parenting time. However, any issues regarding temporary custody and parenting time became moot upon entry of the decree of paternity establishing permanent custody and parenting time. See, *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004) (temporary order rendered moot when permanent custody order entered); *Mann v. Rich*, 18 Neb. App. 849, 794 N.W.2d 183 (2011) (any issue relating to temporary order is moot after it is replaced by more permanent order).

To the extent that Gerald takes issue with the effects of the temporary order on child support matters, the paternity decree on May 8, 2019, and the subsequent orders on September 26 and October 3 corrected the amount of Gerald's monthly child support owed under the temporary order. And Gerald does not claim error with respect to the recalculation of the monthly child support obligation owed under the temporary order.

### 3. Settlement Agreement

Gerald contends the district court erred by not enforcing the settlement of the parties that was reached in the presence of the trial court in chambers on October 1, 2018.

As set forth previously, the district court met with the parties' counsel in chambers after the lunch recess on October 1, 2018. Apparently, discussion was had as to how the court was inclined to rule based on what it had heard so far at trial, and rather than resuming trial, the parties thereafter attempted to draft a decree but could not agree on the terms they thought the court had indicated. Several motions were filed.

On October 5, 2018, Ashley filed a motion for the district court "to reconsider and amend its findings from the paternity trial held September 28 and October 1 of 2018, to enlarge the record to allow rebuttal witnesses and closing statements as

neither were allowed, to clarify the decision of this Court, and for a new trial." In support of her motion, Ashley stated:

16. [Gerald] is not capable of being a joint-physical custody parent and it is not in the children's best interests that the children spend almost half their time with [Gerald].

17. The trial abruptly ended at 11:30am on October 1, 2018 in the middle of [Gerald's] testimony after the Court had originally taken a break for lunch.

18. [Ashley] was not allowed rebuttal witnesses.

19. [Ashley] was not allowed . . . a closing argument.

20. [Gerald] is in contempt for not following the temporary order regarding parenting time, child support arrears, and child care expenses.

21. The Court did not provide a detailed purge plan and Counsel for Parties disagree as to said purge plan.

22. The Court did not provide a detailed timeline for which [Gerald] must pay a portion of [Ashley's] attorney fees.

23. Clarity is needed regarding the obligation of the parents to ensure the children attend extracurricular activities.

24. The Court's decision is not in the best interests of the minor children[.]

25. The Court's decision regarding custody is contrary to law.

The district court and parties' counsel apparently met again in November 2018, but such proceedings do not appear in our record. However, the "Judges Notes" for November 16 appear in our transcript and state: "Matter came up for Motion to Clarify. Trial continued to 1/23/19 at 10a.m."

On November 28, 2018, Gerald filed a motion for entry of decree. Gerald alleged:

[T]rial was held . . . on September 28, 2018 and October 1, 2018. [Gerald's] counsel was instructed to prepare a Decree. [Gerald's] counsel forwarded [Ashley's] Counsel

a proposed Decree and Parenting Plan the following day on October 2, 2018. [Ashley] filed a Motion for Clarification as to certain terms of the Decree, which was heard before the Court on November 16, 2018 and certain matters were clarified.

Gerald attached a proposed decree which he believed was "wholly reflective of the nature of the proceedings as well as the Court's finding and Orders," with the exception that Gerald added a paragraph providing that both parties shall be awarded the 7 days of parenting time of their choosing each year, to accommodate for special events that each parent may want to spend with the minor children. In relevant part, the proposed decree awarded sole legal custody to Ashley, but awarded the parties joint physical custody—Ashley was to have parenting time 8 out of every 14 days and Gerald was to have parenting time 6 out of every 14 days; the parties were to have equal parenting time during the summer.

On November 29, 2018, Ashley again filed a motion for the court "to reconsider and amend its findings from the paternity trial held September 28 and October 1 of 2018, to enlarge the record to allow rebuttal witnesses and closing statements as neither were allowed, to clarify the decision of this Court, and for a new trial." In support of her motion, Ashley made the same statements as in her October 5 motion. Also, on November 29, Gerald filed an objection to Ashley's motion.

At a hearing on December 4, 2018, the parties and the district court set forth their recollections of what had transpired following the lunch recess on October 1. Gerald's counsel contended that the parties had reached a settlement in chambers and wanted the court to enforce the settlement and enter the proposed decree wherein the parties were to have joint physical custody—Gerald was to have parenting time 6 out of every 14 days. However, the court noted that Ashley's counsel did not agree and wanted to finish the trial. Ashley's counsel stated that in November, the court "made a decision that we would schedule a two-hour opportunity for us in January

[2019] to finish the testimony, not only of my client, but also of [Gerald] and allow the parties to submit their closing arguments," and therefore, Ashley objected to Gerald's motion to enter a decree.

The district court recollected that when they had trial, it was not complete; that during a break, the court informed the parties' counsel what it thought would be appropriate based on the evidence it had heard; and that the parties' counsel said they would try to put together a decree, but since then counsel disagreed as to what they thought the court was going to propose. The court did not think "either [was] correct a hundred percent." The court said that "we'll just finish the trial in January." Gerald objected to "re-opening this matter." During the discussion that followed, the district court stated:

> I believe a settlement was reached [on October 1, 2018]. But because that wasn't memorialized, because we didn't come back out in the courtroom and put in on the record at that time, I don't believe it's enforceable by the Court.
> I think you get a chance to finish, if that's what you want.

Trial thereafter resumed on January 23, 2019.

We have previously set forth the parties' testimony from January 23, 2019. The testimony suggests that the parties had an understanding of a new parenting time arrangement after October 1, 2018, which, according to Gerald, gave him parenting time 6 out of 14 days. And upon our review of the record, it appears the parties started exercising an 8/6 parenting time schedule. Besides the testimony of the parties, Ashley's counsel stated during closing arguments that "even after the second day of trial, [Ashley] allow[ed] [Gerald] to have six days every 14 days because it seemed as those [sic] perhaps there was something going on with the Court's direction."

At the motion for reconsideration, the following colloquy was had:

> [Gerald's counsel:] And, Your Honor, after trial, on September 28th and October 1st, you knew everything that happened at the temporary hearing. And you had

two days of trial and you said this man needs to have more time with his children, and you gave him six out of 14 days. Six out of 14 days.

[Ashley's counsel:] Objection, Your Honor. That misstates facts not in evidence. There was no order.

THE COURT: Sustained.

[Gerald's counsel:] Your Honor, it's been stipulated to. It's in all the testimony.

THE COURT: No, it's sustained.

[Gerald's counsel:] Your Honor, after October 1st of 2018, [Gerald] had six out of 14 days that's been stipulated to on the record. We had a trial.

[Ashley's counsel:] Objection, Your Honor. That misstates facts not in evidence. There's nothing stipulated to as far as the time is concerned on the record.

[Gerald's counsel:] It's permeated in the record, Your Honor.

THE COURT: The motion is sustained.

[Gerald's counsel:] It permeates the record.

THE COURT: Objection is sustained. Excuse me.

Additionally, at trial, Gerald's understanding was that Ashley would owe him child support under an 8/6 parenting time schedule. And in the district court's order nunc pro tunc, Gerald's temporary child support obligation was amended, in part because Ashley owed Gerald child support from October 1, 2018, through May 1, 2019. This would again suggest the parties were operating under a different parenting time arrangement after the first 2 days of trial. In this instance, we have Gerald, who claims there was an agreement reached in chambers during the break from trial on October 1, which explains why trial ceased that day and the parties started exercising parenting time under an 8/6 schedule. The district court appears to also indicate there was a settlement agreement, but Ashley claims there was no agreement.

[8-11] A settlement agreement is subject to the general principles of contract law. *Strategic Staff Mgmt. v. Roseland*,

260 Neb. 682, 619 N.W.2d 230 (2000). To have a settlement agreement, there must be a definite offer and an unconditional acceptance. *Id*. See, also, *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014) (to create contract, there must be both offer and acceptance; there must also be meeting of minds or binding mutual understanding between parties to contract). A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties about the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances. *Linscott v. Shasteen, supra*. The determination of the parties' intent to make a contract is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction. *Id.* A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract. *Gibbons Ranches v. Bailey*, 289 Neb. 949, 857 N.W.2d 808 (2015).

[12,13] An alleged oral compromise and settlement agreement not made in open court is unenforceable where it is in violation of the statute of frauds or in violation of a court rule requiring all stipulations and agreements of counsel or parties to a suit to be in writing, signed by the parties or their attorneys. *In re Estate of Mithofer*, 243 Neb. 722, 502 N.W.2d 454 (1993), citing *Omaha Nat. Bank v. Mullenax*, 211 Neb. 830, 320 N.W.2d 755 (1982). Conversely, a settlement agreement made in open court on the record, agreed to by all of the parties to the litigation and approved by the court, is enforceable. *In re Estate of Mithofer, supra*.

There is no court rule in Douglas County, which is in the Fourth Judicial District, requiring all settlements to be in writing, signed by the parties or their attorneys. Compare Rules of Dist. Ct. of Fourth Jud. Dist. 4-6 (rev. 1995) (when case is resolved by settlement stipulation, case shall be placed

on inactive status until settlement consummated, at which time case shall be dismissed; if settlement stipulation not consummated, case may be reinstated to active status upon motion of any party), with Rules of Dist. Ct. of Second Jud. Dist. 2-3 (rev. 1995) (all agreements of counsel or parties to suit must be reduced to writing and signed by parties making same and filed with clerk, or they will not be recognized or considered by court), Rules of Dist. Ct. of Fifth Jud. Dist. 5-3 (rev. 2001), and Rules of Dist. Ct. of Seventh Jud. Dist. 7-3 (rev. 1995). In the present case, custody and parenting time decisions would not be subject to the statute of frauds, and there is no court rule requiring that all settlements be in writing or be made orally on the record of the court. In this case, it is alleged there was an oral agreement made in chambers, which counsel for Gerald understood to be a settlement agreement, and which the district court understood to be a settlement, but which it acknowledged had not been placed on the record.

This court has previously addressed the enforcement of an oral settlement agreement. In *Furstenfeld v. Pepin*, 23 Neb. App. 155, 869 N.W.2d 353 (2015), Lisa Pepin (Lisa) filed a complaint against her former husband, Justin Furstenfeld (Justin), to modify the parenting time and support provisions of their dissolution decree. During the ensuing litigation, Lisa, her counsel, and Justin's counsel met to conduct a telephonic deposition of Justin, who was residing out of state. Instead of conducting a deposition, however, the parties, through their attorneys, engaged in settlement negotiations and an apparent agreement was reached. After reaching this agreement, counsel for both parties jointly contacted the district court judge to notify the court of the agreement and to remove the matter from the court's trial calendar. Lisa's counsel proceeded to prepare a stipulation containing the terms of the parties' agreement. Justin refused to sign the stipulation. Lisa filed a motion to enforce the settlement agreement. Specifically, her motion stated that she sought to enforce the oral agreement reached by the parties.

At a hearing on the motion, Lisa testified as to her understanding of what transpired at the meeting that led to the purported agreement. A copy of the stipulation was received into evidence.

Lisa's counsel also called Justin's counsel as a witness to testify in order to provide foundation for an email regarding the oral settlement agreement and to establish that Justin and his counsel engaged in communications during the settlement negotiation meeting. Justin's counsel acknowledged that the day before the meeting, he sent an email to Lisa's counsel which contained the terms on which Justin offered to settle the case. The next day, Justin's counsel arrived at opposing counsel's office to conduct a telephonic deposition of Justin. Justin's counsel confirmed that settlement negotiations ensued, an agreement was reached, and he and Lisa's counsel contacted the court to inform it that the matter had been settled. Later that day, Justin's counsel received an email from Lisa's counsel's assistant which stated that it included the stipulation for modification of decree based on the agreement reached that morning. The email further stated that Lisa's counsel would "'work up'" a child support calculation that "'matche[d]'" a certain figure to attach to the stipulation. *Furstenfeld v. Pepin*, 23 Neb. App. at 161, 869 N.W.2d at 360. Justin's counsel sent the following response to Lisa's assistant:

> "I believe this accurately reflects the agreement. I'll send to [Justin], and once he returns to me the executed original, I will get it to [Lisa's counsel]. The trial date has been removed from the judge's calendar, so we're not under a rush, although I think we told the judge we'd get it to him for approval by the end of next week. Neither party will need to appear since we're not changing custody or parenting time."

*Id.* On cross-examination, Justin's counsel stated that Justin had not given him the right to sign off on anything. Later in the hearing, Justin testified that he did not authorize his attorney to make the settlement offer contained in the email.

The district court entered an order finding that the parties had entered into a binding settlement agreement that resolved all material terms of the dispute. The court further found that the proposed stipulation entered into evidence accurately reflected the terms of the parties' agreement. The court approved the terms of the stipulation and directed Lisa's counsel to prepare an order consistent with the stipulation; the court subsequently signed the prepared order. Justin appealed.

On appeal, this court found that Justin had not rebutted the presumption that his attorney was authorized to make statements on his behalf. This court further found that the district court did not err in allowing Justin's counsel to be questioned on a limited basis because counsel's testimony was material and relevant to the issue being litigated and there was no other witness that could have provided the evidence. Additionally, this court found no error in the district court's conclusion that a settlement agreement may be established by the testimony of the attorney of the party sought to be bound; plain statutory language supported such a result. See Neb. Rev. Stat. § 7-107 (Reissue 2012) (powers of attorneys include the power to bind client by counsel's agreement in respect to any proceeding within scope of proper duties and powers; but no evidence of any such agreement is receivable except statement of attorney, attorney's written agreement signed and filed with clerk, or entry thereof upon records of court). This court concluded the record contained sufficient evidence for the district court to have sustained Lisa's motion to enforce the settlement agreement.

Both *Furstenfeld v. Pepin*, 23 Neb. App. 155, 869 N.W.2d 353 (2015), and one of the cases cited therein, *Lennon v. Kearney*, 132 Neb. 180, 271 N.W. 351 (1937), involve a lawyer's authority to enter into a settlement agreement. And both cases state, "[W]hen an attorney appears in a cause, there is a presumption that the attorney has authority and that presumption continues until the want of such authority is established," and the "burden of proof of such want of authority is upon the party asserting the same." *Furstenfeld v. Pepin*, 23 Neb. App.

at 166, 869 N.W.2d at 363 (other case cited therein for proposition did not involve a settlement), citing *Lennon v. Kearney, supra* (two cases cited therein for proposition did not involve a settlement). However, a reading of both cases reveals that it was not the presumption of authority that actually decided the result. Rather, in both cases, it was the opposing party—i.e., the party wanting to enforce the settlement—that put on evidence as to the lawyer's authority to settle. Having the opposing party present evidence of a lawyer's authority to settle is in line with the Nebraska Supreme Court's holding in *Luethke v. Suhr*, 264 Neb. 505, 650 N.W.2d 220 (2002), a case also cited in *Furstenfeld v. Pepin, supra*.

[14-16] In *Luethke v. Suhr*, 264 Neb. at 513, 650 N.W.2d at 226, the Nebraska Supreme Court held:

> [A]lthough lawyers retain apparent authority to make procedural and tactical decisions through the existence of the attorney-client relationship, a lawyer cannot settle a client's claim without express authority from the client. In other words, where there has been nothing beyond a mere employment or retainer of the lawyer to represent the client in a cause and the lawyer has acquired no other authority to enter into a settlement (such as acquiescence in open court), if the lawyer seeks to enter a settlement, the opposing party should ascertain whether the lawyer has received actual authority from the client to take such action. A party who enters a settlement agreement without verifying the opposing counsel's actual authority to settle does so at his or her peril.

Disputes over a lawyer's authority to settle are factual issues to be resolved by the trial court; however, an appellate court will not set aside a trial court's factual findings regarding settlement disputes unless such findings are clearly erroneous. See *id*.

This case before us is distinguishable from *Furstenfeld v. Pepin*, 23 Neb. App. 155, 869 N.W.2d 353 (2015), in that Gerald did not call Ashley's counsel to testify regarding the settlement agreement, including any email exchanges or other written correspondence to that effect in preparation of

the proposed decree following the in-chambers meeting on October 1, 2018. Thus, our review is limited to the information provided in the motions filed after October 1; the hearing on December 4; the parties' testimony from the third day of trial on January 23, 2019; and the proceedings and orders that followed. That limited information does not affirmatively establish that there was a meeting of the minds regarding any alleged settlement agreement in this case on October 1, 2018, or that Ashley's counsel had received actual authority to settle based upon the discussions held in chambers between the court and the attorneys. Had Gerald's counsel put on evidence similar to that in *Furstenfeld v. Pepin, supra*, if such existed, and further established that Ashley's counsel had authority to settle based on the discussions held in chambers, if that was the case, see *Luethke v. Suhr, supra*, we may have reached a different decision. However, based on the limited record before us as to this issue, we cannot conclude there was an enforceable settlement agreement following the discussions held in chambers on October 1.

### 4. Allowing Children to Testify

Gerald contends that the district court erred by not allowing the children to testify.

In determining custody and parenting arrangements, the court is to consider the best interests of the minor child, one such factor of which is "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning." Neb. Rev. Stat. § 43-2923(6)(b) (Reissue 2016). While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). In those cases where the child's preference was given significant consideration, the child was typically over 10 years old. See *id.*

Prior to trial, Gerald's counsel subpoenaed Cipher and Phoenix to appear at trial on September 28, 2018. When trial began on September 28, it was noted during Ashley's opening argument that the children were brought to court that morning. After opening arguments were completed, the district court indicated that after hearing the evidence, the attorneys could converse and decide when to arrange for the court to hear from the children. At the time of trial, Cipher was 13 years old and Phoenix was 7 years old. After questioning three witnesses, Ashley's counsel stated that "[e]xcept for rebuttal purposes," there were no more witnesses for Ashley. Gerald's counsel also called three witnesses on September 28 and continuing on October 1, including Gerald and Ashley. It was agreed that Ashley's counsel could ask rebuttal questions of Ashley, outside the scope of redirect, so that she would not have to be recalled as a witness.

After Ashley was excused from the stand on October 1, 2018, the district court asked if there was any further evidence from either party. Gerald's counsel said they were supposed to have "some witnesses" there; after being given a brief recess to look for the witnesses, counsel stated that one of the witnesses was "ten minutes" away and that the other could not be reached. Counsel also said:

> I do have a request that you speak with the children before the proceeding concludes. And I don't really want to make closing arguments until you have spoken with the children, Your Honor. If you're willing to entertain waiting until — breaking for lunch and I'll just put on two witnesses, and then I'll ask you to speak to the children.

Ashley's counsel objected, expressing concerns about Gerald's admission that he had talked with the children about problems between the parties and what they have "been told to say." Gerald's counsel replied that Gerald just wanted his children to be heard and that he did not tell them how to testify. Counsel "respectfully request[ed] that [the court] take a few minutes" with the children. Gerald's counsel continued, stating,

"[T]he parents do not need to be present. Counsel does not need to ask questions. But I would ask that Your Honor at least speak with the children in this matter." The court indicated it would "think about that." Trial then broke for lunch, but counsel met with the court in chambers.

As noted previously, there were various motions filed and hearings held to determine whether the case had been resolved. But trial resumed on January 23, 2019. On January 23, Gerald's counsel stated:

> I've decided to rest with the exception that I still would like you to speak to the children. If after the case in chief you feel like you are not going to give [Gerald] at least six days out of 14, I would continue to ask you to speak with the children. But I will rest my case, Your Honor.

Ashley's counsel proceeded to call Gerald as a witness and questioned him, in part, about events that occurred since they had last been in trial on October 1, 2018, including the situation regarding the Kansas City trip. Another witness testified about a verbal altercation she witnessed between Gerald and Ashley on Christmas 2018. And Ashley was called as a rebuttal witness to testify about the situation regarding the Kansas City trip. Counsel then rested Ashley's case, and the attorneys proceeded to closing arguments.

As set forth previously, in the May 2019 paternity decree, the district court awarded Ashley primary physical custody of the children and awarded Gerald regular parenting time every other weekend from Friday at 4 p.m. until Monday at 8 a.m. and every other Thursday from 4 to 7 p.m. (before the weekend in which he does not have parenting time).

At the hearing on Gerald's motion to reconsider, the following colloquy was had.

> [Gerald's counsel:] . . . . [W]hen we rested [on January 23, 2019], for the record, we said we're rested conditioned on six out of 14 days. If Your Honor is not going to order that, please set it for further hearing and speak with the children. The matter concluded on January 23rd.

THE COURT: And the Court overruled both your motions.

. . . .

THE COURT: Well, I didn't grant it, so it's overruled.

[Gerald's counsel:] Okay. I did not have an opportunity to make an offer of proof because I did not know that you were going to overrule it. The way we left things on January 23rd, [Ashley's counsel] had submitted a proposed decree to you. I had submitted a proposed decree to you. And I said, Your Honor, if you're not going to do six out of 14 days, I want you to speak to the children. And I was —

THE COURT: When did the court become Let's Make a Deal?

. . . .

THE COURT: It's my decision whether or not I felt it was appropriate to talk with the children.

[Gerald's counsel:] I understand that.

THE COURT: And it's not Let's Make a Deal. And you can't say if you're not going to do this, Judge, then you got to do that.

[Gerald's counsel:] Your Honor, I would have made an offer of proof as to what the children would testify to had I known that you were not going to order six out of 14 days and you had no intention of speaking with the children. I would have made an offer of proof and, I'll do that today.

On appeal, Gerald argues that the district court erred when it failed to hear testimony from the children. However, when the trial resumed on January 23, 2019, Gerald's counsel stated:

I've decided to rest with the exception that I still would like you to speak to the children. If after the case in chief you feel like you are not going to give [Gerald] at least six days out of 14, I would continue to ask you to speak with the children. But I will rest my case, Your Honor.

Thus, counsel rested, but attempted to make the rest conditioned on how the court might decide the case, and if the

court was not going to rule in Gerald's favor, counsel apparently expected the court to reopen the case to hear from the children. That is borne out later, at the hearing on the motion for reconsideration, when counsel addressed the district court and stated:

> January 23rd, through May of 2019, there was no order from Your Honor. And I was assuming that if Your Honor was going to enter less than six out of 14 days, you would have contacted [opposing counsel] and myself and said, Hey, I need to speak to the children.

[17] Regardless of counsel's assumptions or Gerald's wishes that the court speak to the children, once the attorneys rested their cases, the matter was submitted. At that point, the court was under no obligation to reopen the case to receive testimony from the children. The court was not required to tip its hand regarding its ruling in order to allow Gerald's counsel to decide whether or not to present more evidence through the children's testimony before resting Gerald's case. Because counsel rested, we cannot find any error by the district court in its determination to enter its decision without reopening the case to hear from the children. The reopening of a case to receive additional evidence is a matter within the discretion of the district court and will not be disturbed on appeal in the absence of an abuse of that discretion. *Myhra v. Myhra*, 16 Neb. App. 920, 756 N.W.2d 528 (2008).

### 5. SPECIFIC FINDINGS OF FACT AND PARENTING TIME

Gerald contends the district court erred by not granting his request for specific findings of fact and by not awarding him more parenting time.

### (a) Specific Findings of Fact

[18] Neb. Rev. Stat. § 25-1127 (Reissue 2016) provides in relevant part, "Upon the trial of questions of fact by the court, it shall not be necessary for the court to state its finding, except, generally, for the plaintiff or defendant, unless one

of the parties request[s] it . . . ." In a case tried to the court without a jury, a motion for specific findings of fact must be made before final submission of the case to the court. See *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991). See, also, *In re Estate of Wiley*, 150 Neb. 898, 36 N.W.2d 483 (1949) (after court has announced decision, request made for separate findings of fact and conclusions of law came too late). Gerald did not ask the district court to make specific findings of fact under § 25-1127 until the hearing on his motion for reconsideration. Because Gerald's request was not made until after the case was submitted to the court, the court was not under any obligation to provide specific findings.

### (b) Parenting Time

Gerald argues that the district court should have awarded him parenting time with his children "at least 6 out of 14 days during the school year, ½ of holidays and ½ of the summer as this was in the children's best interest[s]." Brief for appellant at 34 (emphasis omitted).

[19] When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). The best interests inquiry has its foundation in both statutory and case law. Section 43-2923(6) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

The record reveals a contentious relationship between Gerald and Ashley. While both parents appear to love their children, Ashley appears to have a more even temperament. And Gerald has put the children in the middle of his disputes with Ashley—e.g., when he showed Cipher affidavits Ashley and her mother presented to the court and when he made Cipher choose between going to an out-of-town football game a day earlier than Ashley would allow or missing the game. Based on the evidence from trial set forth previously, we cannot say the district court abused its discretion when it awarded Gerald regular parenting time every other weekend from Friday at 4 p.m. until Monday at 8 a.m. and every other Thursday from 4 to 7 p.m. (before the weekend in which he does not have parenting time).

## 6. Clothing Costs

Gerald argues the district court erred when it ordered him to purchase approximately one-half of the children's clothing, even though his child support obligation was based on a sole custody calculation. We agree, as discussed below.

[20] In *Kelly v. Kelly, post* p. 198, ___ N.W.2d ___ (2020), released the same day as this opinion, we set forth the progression of the law regarding child support and various expenses considered in support orders. Prior to the Nebraska Child Support Guidelines, Nebraska statutory law addressed

various expenses, including clothing, to be considered in support orders. See, Neb. Rev. Stat. § 42-369(3) (Cum. Supp. 2018); *Kelly v. Kelly, supra.* Later, in 1987, the Nebraska Child Support Guidelines were created. See *Kelly v. Kelly, supra.* See, also, Neb. Rev. Stat. § 42-364.16 (Reissue 2016) (requires Nebraska Supreme Court to create guidelines that serve as rebuttable presumption in setting child support obligations). Then, in 2008, the Legislature passed 2008 Neb. Laws, L.B. 1014, § 33, codified at Neb. Rev. Stat. § 42-364.17 (Reissue 2016), which specifically sets forth certain categories of expenses—"necessary medical, dental, and eye care, medical reimbursements, day care, extracurricular activity, education, and other extraordinary expenses of the child"—that could be considered in determining parents' financial responsibilities related to their children. See *Kelly v. Kelly, supra*. A trial court has the authority to order a parent to pay the categories of expenses specified in § 42-364.17, in addition to the monthly child support obligation calculated under the guidelines. See *Kelly v. Kelly, supra*. Because the broader, more general terms contained in § 42-369(3) preceded the adoption of the guidelines and the passage of § 42-364.17, we construe the guidelines and § 42-364.17 to control what categories of expenses can be ordered to be paid in addition to a monthly child support obligation when child support has been calculated using the basic net income and support calculation, worksheet 1. *Kelly v. Kelly, supra*. See Neb. Ct. R. ch. 4, art. 2, worksheet 1 (rev. 2016).

As applicable here, when considering § 42-364.17 and what expenses a parent may be ordered to pay in addition to his or her monthly child support obligation which has been calculated using the basic net income and support calculation, worksheet 1, the only category under which clothing could possibly qualify would be "extraordinary expenses." As stated in *Kelly v. Kelly, post* at 198, ___ N.W.2d at ___, "We conclude that such expenses fall within the basic necessities intended to be covered by a monthly child support obligation

calculated using the basic net income and support calcula-
tion, worksheet 1, and do not rise to the level of 'extraordi-
nary expenses.'"

However, an order requiring Gerald to purchase one-half of
the children's clothing would have been appropriate had the
court ordered joint physical custody. Neb. Ct. R. § 4-212 (rev.
2011), regarding joint physical custody, provides in relevant
part: "If child support is determined under this paragraph, all
reasonable and necessary direct expenditures made solely for
the child(ren) such as clothing and extracurricular activities
shall be allocated between the parents, but shall not exceed
the proportion of the obligor's parental contributions . . . ."
But, in this case, Gerald's child support obligation was based
on Ashley's primary custody of the children, and thus, Gerald
could be required to pay for only a portion of the children's
clothing if it rose to the level of an "extraordinary expense."
And we have already determined that clothing is a basic neces-
sity intended to be covered by a monthly child support obliga-
tion which has been calculated using worksheet 1.

The district court abused its discretion in ordering that "[t]he
parties shall each purchase the children clothing in an approxi-
mately equal amount." Accordingly, we reverse this portion of
the decree, and the decree is modified accordingly.

### 7. ATTORNEY FEES

Gerald argues that the district court erred in ordering him to
pay $2,885 of Ashley's attorney fees "in light of the fact that
[he] was shorted 26 days of parenting time due to the entry of
an erroneous temporary order and because he was making good
faith efforts to pay financial obligations owed in the temporary
order." Brief for appellant at 49.

An affidavit from Ashley's attorney was received into evi-
dence and stated that counsel had "personally spent at least
11.8 hours of work related to temporary hearing and contempt
issues" and that counsel's office had also incurred fees and
expenses; counsel's rate was $275 per hour. Counsel's para-
legal had also worked on the case for 6.4 hours at a rate of

$150 per hour. Ashley testified that she incurred attorney fees related to three temporary hearings—the original temporary hearing plus two additional temporary hearings requested by Gerald—and she had to file a contempt action when Gerald would not follow the temporary parenting time and child support orders. Ashley was not asking that Gerald be ordered to pay for all of her attorney fees, acknowledging that she was "responsible for initiating the custody" proceedings. But she requested an award of attorney fees "to offset the charges that wouldn't have occurred if [Gerald] would have followed the [temporary] ruling."

The district court ordered Gerald to pay $2,885 of Ashley's attorney fees "due to his inability to follow the temporary order regarding parenting time, child support obligations, and child care obligations and the legal fees incurred by [Ashley] due to same."

The record is clear that Gerald was not prepared for the temporary hearing in September 2017, at which he appeared pro se. Following the temporary hearing and order, he failed to follow the parenting time schedule and failed to fulfill his child support obligation. After Gerald obtained counsel, he sought further temporary orders, necessitating Ashley to employ her counsel's services. Gerald's attempts to obtain further temporary orders regarding parenting time and child support were not successful. At the time trial commenced, Gerald had not paid any of the court-ordered childcare costs and he was behind in paying child support. Between September 2017 and June 2018, Gerald paid only $1,050. Between June 26, 2018, and the completion of trial on January 23, 2019, Gerald had paid a little more than $2,000; he never once paid his full monthly obligation. By the time trial concluded, Gerald was thousands of dollars in arrears in child support (approximately $10,000 in arrears and interest as of January 23, 2019, but we recognize that the temporary child support order was modified in the final decree). Accordingly, we find no abuse of discretion by the trial court, and we affirm its award of $2,885 in

attorney fees to Ashley. See *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999) (award of attorney fees in paternity action reviewed de novo on record to determine whether there has been abuse of discretion by trial judge; absent such abuse, award will be affirmed).

### 8. Transcription Costs in Preparation for Motion for New Trial

Gerald contends that the district court erred by not granting his IFP request for transcription of court hearings or, alternatively, in not ordering Ashley to pay for the same so that he could "adequately prepare for Motion for New Trial." Brief for appellant at 47 (emphasis omitted).

After the paternity decree was filed on May 8, 2019, Gerald filed his motion to reconsider on May 15. At a hearing on May 31, Gerald's counsel mentioned that she had previously sent a letter to the court requesting that an IFP order be entered for Gerald because he requested a "transcript" of the entirety of the proceedings so counsel could have them before the hearing on the motion to reconsider. Counsel renewed the IFP request on the record and requested that the court grant the IFP, that a "transcript be prepared," and that the hearing be continued until counsel had the opportunity to review the transcript.

On June 6, 2019, Gerald filed a "Motion for Transcript." Gerald requested that the district court "enter an IFP Order allowing him to receive a transcription of the proceedings or an order for [Ashley] to pay for transcription of these proceedings" prior to his hearing and argument on his motion to reconsider. In his affidavit attached to the motion, Gerald states:

> In order for [him] to have procedural and substantive due process and a fair proceeding, given the unusual progression and unusual length of these proceedings, counsel for [Gerald] needs to review the entirety of the over eight (8) month time period of trial and also hearings that occurred prior when [Gerald] was pro se.

Gerald also believed that the court needed to review the evidence in its entirety when making a final ruling on his motion to reconsider.

A hearing was held on June 27, 2019, regarding Gerald's request that the district court enter an IFP order for him to be able to receive "a copy of the complete transcript" or, alternatively, to order Ashley to pay for it. Received into evidence was Gerald's affidavit with pay stubs attached ($2,169.46 gross and $1,123.67 net from April 21 to May 18, 2019), and his 2018 W-2 wage and tax statement ($31,490.12 for the year); he claimed his monthly expenses set forth in the affidavit exceeded his income. The court noted that according to the pay stubs, Gerald was not working full time—he was working approximately 60 hours in a 2-week period. The court stated, "I have no information for why he's not working full time. I don't find him to be below the poverty level, and I'm not sure how it's going to support the request to proceed IFP." Gerald then asked the court to order Ashley to pay for the transcript. Ashley's counsel argued she should not have to pay for it. Counsel noted that Gerald argues he does not have the ability to pay for the transcript, but he had purchased plane tickets to take the children to New York. The court stated, "I'm not going to order [Ashley to] pay for the transcript." On June 28, 2019, the district court denied Gerald's motion for a transcription of the proceedings.

Neb. Rev. Stat. § 25-2301.01 (Reissue 2016) states:

> Any county or state court, except the Nebraska Workers' Compensation Court, may authorize the commencement, prosecution, defense, or appeal therein, of a civil or criminal case in forma pauperis. An application to proceed in forma pauperis shall include an affidavit stating that the affiant is unable to pay the fees and costs or give security *required to proceed with the case*, the nature of the action, defense, or appeal, and the affiant's belief that he or she is entitled to redress.

(Emphasis supplied.) Gerald's desire to have the earlier proceedings transcribed was not absolutely necessary to his

motion to reconsider, and we therefore find that it is not the type of "required" fees and costs anticipated by the statute.

Additionally, we are unaware of any authority, and Gerald points us to none, that would require Ashley to pay for a transcription of the proceeding so that Gerald could prepare for a hearing on his own motion.

## VI. CONCLUSION

We reverse the portion of the paternity decree which states, "The parties shall each purchase the children clothing in an approximately equal amount." The May 8, 2018, paternity decree is modified accordingly. We otherwise affirm the paternity decree, as well as the October 3 order nunc pro tunc dealing with Gerald's child support obligation.

AFFIRMED AS MODIFIED.