IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

CLINE V. HARTMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TYRELL S. CLINE, APPELLEE,

V.

JANIE A. HARTMAN, APPELLANT.

Filed December 13, 2022.    No. A-22-274.

Appeal from the District Court for Hall County: ANDREW C. BUTLER, Judge. Affirmed.

Mitchell C. Stehlik and Anna L. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellant.

No appearance for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Janie Alicia Hartman (Alicia) appeals from an order of the Hall County District Court awarding her and Tyrell S. Cline joint legal custody of their child, Cherish F., but awarding primary physical custody to Tyrell. On appeal, Alicia challenges the physical custody award, contending that the court should have awarded her primary physical custody of Cherish. She further contends that the court erred when it allowed Cherish to provide testimony in camera outside the presence of the parties and counsel and did not allow the parties to "respond to [Cherish's] testimony." For the reasons set forth below, we affirm.

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

Alicia moved to Nebraska in October 2006 and began living with Tyrell. Cherish was born in July 2007. Alicia and Tyrell were never married and had an off-and-on relationship for several

- 1 -

years until they separated for the last time in 2016. Prior to 2019, no court order had been entered regarding the custody of the parties' child.

On December 27, 2019, Tyrell filed a "Complaint to Establish Custody and Support," alleging that Cherish had been "abandoned by [Alicia]" and that Cherish was residing with Tyrell at the time the complaint was filed. Tyrell requested temporary and permanent "care, custody and control" of Cherish, as well as temporary and permanent child support from Alicia. Tyrell concurrently filed a "Motion for Ex Parte Custody" requesting ex parte legal and physical custody of Cherish until the hearing regarding temporary custody. The district court granted his "Motion for Ex Parte Custody" that same day.

On April 29, 2020, the district court held a hearing regarding Tyrell's motions for temporary relief. Legal counsel for both parties appeared on the parties' behalf. On that day, the court entered "Orders on Temporary Hearing" granting Tyrell temporary custody "subject to [Alicia's] right to video visitation." The court noted that it would "consider physical visitation for [Alicia] if a motion is made." The record does not show that Alicia filed such a motion at any point after the hearing. The court further ordered Alicia to pay $317 per month to Tyrell in child support beginning April 1, 2020.

On October 25, 2021, Tyrell filed a "Motion to Interview Minor Child" requesting that the district court interview Cherish at the final hearing. On November 23, Tyrell's counsel withdrew as Tyrell's representation in the case and Tyrell filed a "Motion to Continue Trial" to allow him time to obtain new counsel. The court granted the motion, continuing trial to January 21, 2022.

2. MOTION TO INTERVIEW MINOR CHILD

On January 21, 2022, prior to the commencement of trial, the district court heard Tyrell's "Motion to Interview Minor Child." Tyrell appeared pro se and Alicia was present with counsel. The court granted the motion over Alicia's objection, reasoning that Cherish is "a 14-year-old child." The court notified the parties that it would first interview Cherish in camera to determine "if she is going to testify in open court." Alicia objected to the court's preliminary questioning of Cherish based on the court's exclusion of Alicia's counsel from the preliminary questioning. The court provided its reasoning for excluding counsel during the preliminary questioning, stating that the parties could not be present during the preliminary questioning so it could determine if Cherish would be able to candidly testify in open court while in the presence of the parties. Thus Tyrell, a self-represented litigant, would not be present and would have no representation present. As such, it would "not be fair for [Alicia's] representation to be present" during the preliminary questioning.

The district court proceeded to interview Cherish in camera to determine whether she could candidly testify in open court. A court reporter and a bailiff were present, and a verbatim record of the interview was made. Cherish expressed to the court that she would have difficulty speaking in open court regarding her parents. When asked whether she could "be open and honest" while testifying in the presence of her parents, Cherish stated that she could do so when discussing her "schooling and [her] friends" but that when discussing "the parents," she would not "want to make one of them upset." Cherish indicated multiple times to the court that she would prefer to testify outside the presence of her parents.

The district court notified the parties that it would be interviewing Cherish in camera following the parties' presentation of evidence. Alicia renewed her objection to the court's

allowing Cherish to testify generally and, specifically, to testify outside the presence of counsel. The court noted and overruled Alicia's objections. Following the court's decision regarding the in camera interview of Cherish, the parties proceeded to trial.

### 3. Trial Evidence

Several witnesses testified and numerous exhibits were received into evidence. We now summarize the evidence relevant to the issues on appeal.

### (a) Alicia's Testimony

Alicia testified about the domestic violence in her relationship with Tyrell. She stated that in March 2007, while she was pregnant with Cherish, Tyrell "chucked [her] over a table into the wall, dragged [her] into the living room[,] . . . [and] started kicking [her] in the stomach." She stated that Tyrell did not allow her to go to the hospital that night, but the following morning she "passed out" at work. Alicia stated that her coworker requested emergency assistance and she was taken to the hospital for treatment. Hospital records indicate that Alicia's fainting spell was related to her pregnancy. The records further indicate that she had "bruising about the face and some on the lower lip." Hospital personnel noted the "[d]omestic abuse" and "recommended that she avoid the perpetrator by following the recommendations of the police who have recommended that a safe house be arranged." Following this incident, Alicia moved to Missouri to live with her mother and stepfather.

Cherish was born while Alicia was living in Missouri. Six weeks later, Tyrell went to Missouri to see Cherish. Beginning in August, the parties cohabitated for approximately 9 months, first in Missouri, then in Nebraska. Alicia stated that during this period, there were "multiple incidents" involving domestic violence. She described numerous assaults, including one where Tyrell "smashed [Alicia's] head into . . . a wall[,] so bad that it put a hole in there." She stated that an ambulance was summoned as a result of the incident. She described another incident where Tyrell "punched [her] in the face in front of 15 people." She further stated that Tyrell had broken her nose when they lived in Missouri and once assaulted her while they were in Tyrell's mother's vehicle.

Alicia also discussed the lack of involvement Tyrell had in Cherish's life prior to 2019. She stated that from 2007 to 2015, she would bring Cherish to Tyrell's mother's home in Nebraska "three to four times a year" on various holidays and special occasions. She stated that she notified Tyrell 2 weeks prior to each visit but that he would only spend "about 5 or 10, 15 minutes at a time" with Cherish during visits. She stated that on "four or five" separate occasions, she sent Tyrell $500 so he could travel to Missouri to visit Cherish. Sometimes he would "just t[ake] the money" and "not show up." However, in December 2015, he "finally took the opportunity" and traveled to Missouri for Cherish's Christmas pageant. Alicia testified that she and Tyrell discussed "work[ing] on the family" and Alicia traveled with Cherish to Nebraska to spend time with Tyrell.

In 2016, Alicia learned that Tyrell was "seeing" another woman. Alicia stated that she confronted Tyrell while he was visiting in Missouri, and he became angry. He "grabbed Cherish out of [Alicia's] arms, yanked her, [and] took her into the room." Cherish became upset and "started screaming." Tyrell then told Alicia that it was her fault that Cherish would not let him hold her. He then "chucked" Cherish at Alicia and told Alicia that he would "F-ing kill [her] with

no remorse right in front of [Cherish]." Following this incident, Tyrell did not see Cherish in person until 2019.

In September 2019, Alicia left Missouri to distance herself from her mother after their relationship became strained. Alicia moved to Florida and began a nursing program, leaving Cherish in Missouri to complete the school semester. Despite the issues Alicia and her mother had with each other, Alicia's mother had "always been good to Cherish," so Alicia left Cherish in her mother's care. The plan was for Cherish to remain in Missouri until December 18, at which time Alicia's mother would bring Cherish to join Alicia in Florida. Alicia's mother did not bring Cherish to Florida on December 18 as they had planned. Instead, Tyrell went to Missouri and took Cherish to Nebraska on December 25 without notifying Alicia.

Alicia stated that a week before Tyrell took Cherish to Nebraska, he called Alicia to ask why she was not in Missouri with Cherish. Alicia stated that Tyrell did not express any concerns to her about Cherish's wellbeing during the call.

Alicia notified her mother and Cherish's godmother that she intended to pick Cherish up herself on December 25, 2019. Before Alicia went to Missouri, Cherish's godmother notified her that Tyrell had taken Cherish and that he had "showed up with paperwork from a courthouse in Nebraska stating that he had every legal right to" do so.

Alicia stated that although she and Cherish had been close, Cherish's move to Nebraska had taken a "big toll" on their relationship. She testified that she attempted to seek visitation with Cherish and that she had spoken with Cherish on the phone "almost every day" since she has been with Tyrell.

Alicia testified that she had given birth to another child in the year prior to trial. On cross-examination, Alicia stated that although she frequently spoke with Cherish, she had not notified Cherish that she had another child because she was advised to keep the information from Tyrell for safety purposes.

Alicia testified that she believed it would be in Cherish's best interests to move with her to Florida. She stated that she would be graduating from her nursing program in the spring, had been accepted to a midwifery program, works as a medical scribe, has a two-bedroom apartment, and had applied for a three-bedroom apartment. She also stated that there is a high school within walking distance from her apartment that Cherish could attend.

(b) Tyrell's Testimony

Tyrell testified that in December 2019, "[t]he week before Christmas," he learned that "[Alicia] left Missouri, and left Cherish there in August to move to Florida." He stated that he immediately traveled to Missouri to check on Cherish and upon his arrival, he asked Cherish whether she would like to return with him to Nebraska. Cherish expressed to him her preference to stay in Missouri. He notified Cherish that if she changed her mind, she could reach out to him and he would "come get [her]." On Christmas Eve, Cherish requested that Tyrell pick her up from Missouri. He stated that he arrived in Missouri on Christmas Day, picked Cherish up from her godmother's house, and brought her home with him to Nebraska. He stated that Cherish has been with him since.

Tyrell testified that Alicia had not requested in-person visitation with Cherish since he brought Cherish to Nebraska in 2019, but that Cherish and Alicia had "constant" phone contact.

He further stated that he never attempted to limit Alicia's contact with Cherish. When Cherish did not speak with Alicia, it was "Cherish's decision not to answer . . . [or] call."

Tyrell described his family's home environment. He testified that he lives with his wife, Denise Cline, their two daughters, and Cherish. His son from a prior marriage also visits on alternating weekends. He stated that Denise had bonded with Cherish, they "openly talk to each other," and Denise asks Cherish "what she's doing in school, what she's learning in art." He also stated that although Cherish and her half-siblings "sometimes bicker," Cherish loves, takes cares of, and plays with them. He generally described Cherish's relationship with her half-siblings as "healthy."

Tyrell discussed Cherish's wellbeing since moving to Nebraska. He stated that Cherish receives "A's and B's" in school, participates in extracurricular activities, including "[v]olleyball, basketball, [and] track and field," and that he takes her to doctor's and dentist's appointments.

Tyrell also discussed his employment. He stated that he had a history of working with construction companies but that he was unemployed at the time of the trial. However, he had received a "letter of intent" from a construction company, indicating that he would begin employment with them in February 2022. His salary would be $85,000 per year and his health insurance would cover him and his family, including Cherish.

The district court asked Tyrell about his history of domestic partner abuse. Tyrell stated that his last "domestic violence" conviction was in 2017 and that the victim was his ex-wife. He stated that he had never been charged with domestic assault of Alicia. He admitted that there was domestic violence in his relationship with Alicia, but stated that he and Alicia "were both involved" in the domestic violence. During his relationship with Alicia, he had "a very big problem with alcohol." He also struggled with substance abuse for a "three month period" in 2007. However, he indicated that he had since successfully rehabilitated; he seldom drank alcohol and he no longer used drugs.

On cross-examination, Tyrell admitted that he was also convicted of domestic assault in 2009. The victim was his son's mother. When asked whether he had "taken any steps to address what's leading to" the domestic violence-related convictions, he stated that he had completed his probation and required classes. He also stated that he had attended therapy and continues to attend "as needed." He specified that he had a monthly "check-in" with a "VA" counselor, but that he can reach out to the "VA" for mental health services up to three times per week.

During redirect examination, the district court asked Tyrell to specify the classes he took relating to his "domestic violence convictions." He stated that he took anger management classes and successfully completed the Domestic Violence Intervention Program, a 36-week course. He stated that he benefited from the course and that he learned how to "handle[] things differently."

(c) Cherish's Testimony

After the parties rested, the district court conducted an in camera interview of Cherish outside the presence of the parties and counsel. Because Cherish indicated she would have been comfortable discussing school and her friends with her parents present, we summarize her testimony as to those matters. However, given Cherish's discomfort talking about her parents with them present, we will set forth only the inconsistencies, if any, between Cherish's testimony and the district court's ultimate findings.

Regarding her schooling in Nebraska, Cherish testified that she likes her school because she believes it will "give [her] a big chance of a good education." She informed the district court that she is doing well academically, earning "A's and B's." She stated that her favorite subjects are science and drawing and that she has significantly improved in math because she is comfortable "get[ting] help" at her school in Nebraska. She stated that she appreciates the small size of her school and would not want to transfer to a bigger school where she would not "know everybody" and would "be more stress[ed]." She has made close friends and is "liked by almost everybody in [her] grade." She participates in many extracurricular activities, including basketball, volleyball, and track. She also stated that she is "getting really into golf" and plays softball.

Cherish testified about her relationship with Denise and her half-siblings. She stated that she "feel[s] really safe with Denise and [Tyrell]" and that "Denise is probably one of the best stepmoms you could ever ask for." She stated that she knows she is "appreciated and loved" by Denise and that Denise does not "put [her] aside" for her own two children. She stated that even though her younger sisters are "still learning stuff" and "[t]hey cry," she enjoys "hanging around with them[] [and] teaching them."

Regarding Cherish's relationship with Tyrell and Alicia, we find no inconsistencies between Cherish's testimony and the district court's findings as set forth next.

### 4. DISTRICT COURT'S ORDER

On March 22, 2022, the district court entered an "Order of Custody, Parenting Time, and Child Support" granting Tyrell and Alicia joint legal custody of Cherish, but granting primary physical custody to Tyrell subject to Alicia's parenting time. Under the court's parenting plan, Alicia would have parenting time: one weekend per month; for part of Cherish's "Christmas," "Spring," and "Fall" breaks from school; and for 7 consecutive weeks during the summer. The court also ordered Alicia to pay $50 per month to Tyrell in child support.

The district court provided its reasoning for granting Tyrell primary physical custody of Cherish. It weighed the various factors set out by Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) to determine whether it was in Cherish's best interest to remain in Nebraska with Tyrell or to leave the state to live with Alicia in Florida.

The district court first considered Cherish's relationship to each parent prior to commencement of the action. The court found that although Cherish had lived with Alicia from birth until December 2019, Cherish did not have a particularly close relationship with her mother. While in Alicia's care, Cherish spent much of her time with her maternal grandmother because Alicia worked late to support herself and her daughter. The court acknowledged that, during this period, Cherish "did not have a significant relationship with her father" either. For much of Cherish's life, Tyrell did not take an interest in assuming the responsibilities of parenthood. However, the emotional relationship between Cherish and her parents changed over time following her move to Nebraska.

The district court found that Cherish's relationship with Tyrell "gr[ew] in a positive way" and Cherish developed strong relationships with her half-siblings and Denise. On the other hand, Cherish's relationship with Alicia became strained because Cherish did not see her in person for over 2 years. In that time, Alicia had given birth to another child with a subsequent partner that Cherish was not fond of. Cherish did not learn of her new sibling until the date of trial. The court

found that "[t]he new sibling and [Alicia's] significant other appear to be major barriers to the current relationship between Cherish and [Alicia]."

The district court next considered Cherish's desires and wishes. The court noted that Cherish demonstrated a preference for remaining in Nebraska because she had "finally found a community and school that has allowed her to expand her general welfare and social behavior." She indicated that she enjoys going to school, has many friends, and participates in various extracurricular activities. While the court noted that Cherish seemed "open to rebuilding the relationship with her mother," it ultimately found that Cherish "did not express any interest in moving to Florida on a permanent basis to live with her mother."

The district court also discussed the "general health, welfare, and social behavior" of Cherish. Cherish was 14 years old at the time of trial, had started high school, and "handled the situation with a sense of maturity." It found that Cherish "appeared to be healthy" and "well cared for." The court observed that Cherish liked her school in Nebraska, was doing well academically, and had developed close relationships with her classmates. The court also noted that Cherish had established relationships with her half-siblings "on her father's side" but that she did not even know of her sister on her mother's side until the date of trial. The court found that "the deliberate withholding of Cherish's newest sibling until the day of the hearing . . . may have cause[d] significant damage in Cherish's relationship with [Alicia]." The court ultimately found that it was in Cherish's best interest that she continue "attending school and living in . . . Nebraska."

The district court finally discussed "[c]redible evidence of abuse inflicted on any family or household member" and "[c]redible evidence of child abuse or neglect or domestic intimate partner abuse." The court stated that although there was "brief testimony of neglect," it ultimately found there was no "credible evidence of child abuse or neglect." The court also found that there was no evidence of "abuse inflicted on any current family or household member by either [Tyrell] or [Alicia]." However, the court did find that there was "credible evidence of [domestic partner] abuse from [Tyrell]."

The district court stated that in considering Tyrell's history of domestic partner abuse, it "consider[ed] what rehabilitation has occurred and when the events of domestic abuse occurred." The court noted that the domestic partner abuse in Tyrell and Alicia's relationship "is from many years ago and the parties have not been in a relationship for a significant period of time." The court also found that Tyrell was forthcoming about his history of domestic partner abuse, noting Tyrell's testimony that although he once struggled with "substance use and . . . domestic violence," "his life [had since] changed." The court also noted Tyrell's testimony that he had successfully completed his term of probation "for domestic abuse[,] that included completion of a Domestic Violence Intervention Program." The court found Tyrell's testimony to be credible.

After weighing the above factors, the court ultimately concluded that it was in Cherish's best interests that she remain with Tyrell in Nebraska.

Alicia appeals.

### III. ASSIGNMENTS OF ERROR

Alicia assigns, restated and renumbered, that the district court erred in (1) interviewing Cherish in camera outside the presence of counsel, (2) failing to provide Alicia an opportunity to

respond to the testimony provided during the in camera interview, and (3) awarding Tyrell primary physical custody of Cherish.

## IV. STANDARD OF REVIEW

A trial court's ruling on a motion to conduct an in camera interview of a minor child in custody proceedings is reviewed for an abuse of discretion. See *Donscheski v. Donscheski*, 17 Neb. App. 807, 771 N.W.2d 213 (2009).

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## V. ANALYSIS

### 1. IN CAMERA INTERVIEW

Alicia asserts that the district court erred in allowing Cherish to testify in camera outside the presence of Alicia's counsel.

In determining custody and parenting arrangements, the court is to consider the best interests of the minor child. § 43-2923(6). Section 43-2923(6) sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in regard to custody, including "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning." While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). In those cases where the child's preference was given significant consideration, the child was typically over 10 years old. See *id*.

In *Donscheski v. Donscheski, supra*, this court found that the lower court abused its discretion when it refused to grant a party's request for an in camera interview of the child whose custody was at issue. In that case, the child "was 12 years old" and "received mostly A's and B's in school." We found that the child was of "sufficient age and intelligence to be heard[] and [have] his preference . . . considered."

In this case, Cherish was 14 years old at the time of trial and had started her freshman year of high school. Much like the child in *Donscheski, supra*, Cherish was doing well academically— earning "A's and B's"—and the district court observed that she appeared to "handle[] the situation with a sense of maturity." The record supports the court's implicit finding that Cherish was of sufficient age and intelligence to have her preferences considered.

The core of Alicia's contention with the in camera interview is the procedure the district court elected to use in conducting the interview. Specifically, she contends that the court erred when it did not allow Alicia's counsel to be present during the interview and failed to provide the parties with "notice as to the nature of the testimony after the fact" and an opportunity to respond to Cherish's testimony. We discuss these assignments of error in turn.

### (a) Presence of Counsel

During the hearing and in its order, the district court discussed its reasoning for excluding Alicia's counsel during the in camera interview. It reasoned that it would be improper to exclude Tyrell, a pro se litigant, from the interview but to allow Alicia's counsel to be present during the interview. The court further noted that it not only would be inequitable to permit Tyrell to be present but not Alicia, but the presence of either party would defeat the purpose of an in camera interview—to allow Cherish to candidly communicate her wishes to the court without fear of "disappoint[ing] either her mother or father." As such, the court would have to either forgo the interview or conduct an in camera interview outside the presence of the parties and Alicia's counsel. Given the facts, the court properly granted Tyrell's motion and crafted an interview procedure that was equitable under the circumstances. As such, we cannot find that the court abused its discretion.

We note that Alicia cites to Neb. Ct. R. § 6-205 to implicitly argue that the district court erred in conducting the in camera interview outside the presence of the parties. Alicia specifically refers to the following provision in § 6-205:

> The court may receive preliminary evidence concerning the matters noted in § 6-204 in camera, in the presence of counsel for the parties and such other members of the public who have requested the right to be present.
>
> Persons desiring to be present not represented by counsel shall be considered as appearing Pro Se and shall be bound by the orders of the court in regard to such hearing.

Alicia's reliance on this provision is misplaced since the rule provides guidelines to Nebraska trial courts as to when a proceeding may be closed from the general public.

### (b) Review of Interview

Alicia also argues that the district court abused its discretion "[b]y refusing to allow [Alicia] to be notified as to the nature of the testimony," denying her "the right to respond to the evidence presented against her." She notes that "[o]ther jurisdictions have determined that if an in camera interview of the minor child is conducted that the court should release a record [of] the private interview to the parties." Brief for appellant at 16. However, Nebraska has not adopted a rule on this particular issue and we decline to do so now because Alicia failed to request that the trial court inform her of the substance of the interview and be given an opportunity to respond. *V.C. v. Casady*, 262 Neb. 714, 634 N.W.2d 798 (2001) (issues not presented to trial court may not be raised on appeal).

## 2. PRIMARY PHYSICAL CHILD CUSTODY

Alicia contends that the district court should have awarded her primary physical custody of Cherish. When deciding custody issues, the court's paramount concern is the child's best interests. *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020). Section 43-2923(6) provides that in determining custody and parenting arrangements:

> [T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

In addition to the statutory factors relating to the best interests of the child, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. See, *State on behalf of Dawn M. v. Jerrod M.*, 22 Neb. App. 835, 861 N.W.2d 755 (2015); *Collins v. Collins*, 21 Neb. App. 161, 837 N.W.2d 573 (2013).

Alicia argues that the district court abused its discretion when it granted Tyrell primary physical custody of Cherish because "[t]here was significant and undisputed evidence as to domestic intimate partner abuse committed by [Tyrell]." In support of her argument, Alicia recites in her brief on appeal the various instances of domestic partner abuse she testified about during trial.

In determining Cherish's best interests, the district court dedicated significant discussion to the statutory factors of "[c]redible evidence of abuse inflicted on any family or household member" and "[c]redible evidence of child abuse or neglect or domestic intimate partner abuse" in its order. The court stated that although "there was brief testimony of neglect" it did "not find any neglect to have occurred." However, the court did find that there was credible evidence that Tyrell had a history of domestic partner abuse. It acknowledged that Tyrell "has been convicted of a domestic abuse assault on at least one occasion" and that he previously had "issues with domestic violence." The court also noted that both parties testified that there was domestic partner abuse in their relationship. However, the court also considered "what rehabilitation has occurred and when the events of domestic abuse occurred," noting that the domestic violence in parties' relationship took place "many years ago" and Tyrell had since successfully rehabilitated.

Furthermore, domestic partner abuse is one of many factors that a trial court must consider to determine the best interests of a child. In this case, the district court thoroughly weighed the factors set forth in § 43-2923(6) and other relevant information to determine that it was in Cherish's best interest that she remain with Tyrell in Nebraska. Having reviewed the record de novo, we find the district court's rationalization for its decision to be supported by the evidence. Accordingly, we cannot say the district court abused its discretion by awarding primary physical custody of Cherish to Tyrell, subject to Alicia's parenting time as set forth in the court's parenting plan.

## VI. CONCLUSION

For the reasons set forth above, we find that the district court did not abuse its discretion when it interviewed Cherish in camera outside the presence of counsel and we affirm the district court's March 22, 2022, order granting Tyrell primary physical custody of Cherish.

AFFIRMED.