IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


VAN DYKE V. VAN DYKE


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


RYAN J. VAN DYKE, APPELLANT,

V.

AMARIS Z. VAN DYKE, APPELLEE.


Filed December 27, 2022.    No. A-21-795.


Appeal from the District Court for Sarpy County: STEFANIE A. MARTINEZ, Judge. Affirmed.

Philip B. Katz and Catherine Dunn Whittinghill, of Gross, Welch, Marks & Clare, P.C., L.L.O., for appellant.

Patrick A. Campagna, of Campagna Law, P.C., L.L.O., for appellee.


MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

In 2013, the Sarpy County District Court entered a decree dissolving the marriage of Ryan J. Van Dyke and Amaris Zephyr Van Dyke (Zephyr, appellee's preferred name). Pursuant to the decree, Zephyr was awarded sole legal and physical custody of the parties' two children subject to Ryan's parenting time, and Ryan was ordered to pay child support.

In 2019, Zephyr filed a complaint to modify the decree and Ryan filed a counterclaim, both seeking a modification of custody and child support. As relevant here, the district court modified certain provisions of the custody and parenting time provisions and modified child support. On appeal, Ryan claims that the district court judge had a conflict of interest and should have disqualified herself. He further challenges certain findings made by the court and its decision not to increase his parenting time. We affirm.

- 1 -

## II. BACKGROUND

Ryan and Zephyr were married in 2002. They have two children: Austin Van Dyke, born in 2007; and Luke Van Dyke, born in 2010.

### 1. DECREE OF DISSOLUTION

In May 2013, the district court entered a decree dissolving the parties' marriage. As relevant here, the court found that Ryan suffered from bipolar disorder. During the marriage, Ryan's condition was not controlled, resulting in various acts of abuse perpetrated by Ryan toward Zephyr, leading to the issuance of a protection order against him. Additionally, Zephyr had post-traumatic stress disorder due to the conditions under which she lived prior to the parties' separation and the ongoing abuse she suffered. Ryan's condition became better controlled by medication and counseling after the parties' separation, but his treatment providers warned that his condition would not go away and it was necessary for him to, at a minimum, continue with medication for the remainder of his life to avoid relapsing into a manic state. There were no current concerns about Ryan's ability to provide proper care for his children. The court awarded Zephyr sole legal and physical custody of the parties' children subject to Ryan's parenting time which included every other weekend from 5 p.m. on Friday to 8 a.m. on Monday, every Wednesday evening from 4 p.m. to Thursday at 8 a.m., specified holidays, and 2 uninterrupted weeks each summer. Ryan was ordered to pay $1,023 per month in child support for the two children.

The district court also ordered Ryan to inform Zephyr of the name and contact information for any psychiatrist or psychologist from whom he was receiving treatment; continue treatment with a psychiatrist and, if recommended by a psychiatrist, any other mental health professional; take all medications as prescribed by his psychiatrist; and sign a release of information to his psychiatrist, psychologist, or any other mental health treatment professionals authorizing them to notify Zephyr if, at any time, Ryan missed a recommended appointment, did not follow recommendations regarding ongoing therapy or counseling, did not take medications as prescribed, or if the treatment provider believed Ryan constituted a danger to his children or was not capable of providing adequate care while they were with him.

### 2. CURRENT MODIFICATION ACTION

### (a) Pleadings, Pretrial Motions, and Orders

On August 20, 2019, Zephyr filed a complaint to modify the decree of dissolution as it related to the children. Zephyr alleged that since the entry of the decree there had been a material and substantial change in circumstances including but not limited to the following: Ryan obsessively focused on certain issues related to the children's health and well-being and repeatedly expressed those obsessive thoughts to Zephyr, the children directly, and to the children's therapist. Ryan engaged in a pattern of questioning the children on various topics regarding Zephyr, their activities, and their therapy sessions. Ryan threatened to pick up the children when it was not his scheduled parenting time and had shown up at certain events to follow the children around. Ryan instructed the children that they were not allowed to discuss certain issues with their therapist. Ryan engaged in a pattern of obsessively texting, emailing, and sometimes calling Zephyr. Ryan engaged in a pattern of obsessively emailing the children's medical professional. Ryan disparaged

Zephyr to the children's medical professionals and obsessively argued that the children were not receiving adequate nutrition or exercise. Ryan's behavior led to the children's therapist, who had been involved for nearly 8 years, to suggest that she would no longer provide therapy. Ryan persistently delayed scheduling his summer parenting time, making it difficult to visit Zephyr's family out of state. Ryan was specifically ordered to sign a release for his mental health professionals to notify Zephyr if certain situations arose and it had been more than 5 years since Zephyr received any communication from those professionals. And Ryan refused to allow one of the children to take medication as suggested by his medical professional.

Zephyr sought an order of modification which, at a minimum, prohibited Ryan from: having any contact with the children's medical professionals other than in the case of an emergency, communicating with Zephyr other than through "Our Family Wizard" or similar online application, communicating with or threatening and intimidating the children's medical professionals, and disparaging Zephyr or the children's medical professionals to the children or in any way suggesting that the children not participate in therapy. She also asked that the order: restrict Ryan's parenting time to a therapeutic setting until such time as the district court could be assured that Ryan's obsessive conduct no longer posed a danger to the children, require Ryan to designate his preferred summer parenting time schedule at an earlier time and through a specific format to eliminate his ability to negatively impact Zephyr's out of state travel with the children, and state that Ryan should not interfere with the children taking medication as prescribed to them by their medical professionals. Additionally, Zephyr sought a modification of Ryan's child support obligation due to his increase in income since the entry of the decree. On August 21, 2019, Zephyr filed a motion for a temporary order seeking temporary relief as to some of the concerns noted.

On October 17, 2019, Ryan filed an answer and counterclaim. In his counterclaim, Ryan sought joint legal and joint physical custody of the children. Ryan alleged that since the entry of the decree there had been a material and substantial change in circumstances in that his mental health diagnosis had significantly improved and that the provisions in the decree requiring him to provide a release of information regarding his mental health treatment were no longer necessary. He also asked that child support be modified in accordance with a joint custody determination pursuant to the Nebraska Child Support Guidelines.

On October 24, 2019, the district court, following an October 2 hearing and its review of submitted affidavits, entered a temporary order prohibiting Ryan from: having any contact with the children's medical professionals other than in the case of an immediate emergency, communicating with Zephyr in any form other than "Our Family Wizard," and disparaging Zephyr and/or the children's medical professionals to the children. The court also ordered that Ryan's parenting time with the children would be through therapeutic supervision until further order of the court.

On December 6, 2019, Ryan filed a motion to terminate the temporary order and reinstate his parenting time. Ryan claimed that absent emergency circumstances it was not legally appropriate to amend the parenting time via temporary order because a change in the established parenting time was one of the underlying issues to be determined by the district court within the modification action. He further alleged that if there was a justified reason to have supervised parenting time in place, it was no longer appropriate because the provider for the supervised parenting time reported that both Ryan and the children enjoyed their visits and Ryan had behaved

appropriately when with the children. Following a hearing, the district court denied Ryan's motion on December 16. Ryan filed a second motion to terminate the temporary order and reinstate his parenting time on March 27, 2020, but the court denied that motion following a hearing on April 8.

On June 3, 2020, Ryan filed a motion for a child custody evaluation, alleging that it would be of assistance to the district court in determining the best interests of the children pertaining to issues of physical custody and parenting time, as well as in addressing the status of each party's mental health relevant thereto. He asked that Dr. Glenda Cottam, a licensed psychologist, be appointed to perform the custody evaluation. On June 23, the court granted Ryan's motion and appointed Dr. Cottam to conduct the evaluation and stated that she would be considered an expert witness for Ryan.

On October 19, 2020, with permission from the district court, Ryan filed an amended answer and counterclaim wherein he sought sole legal and physical custody of the parties' children. Ryan alleged that there had been a material change in circumstances since the entry of the decree warranting the modification in that his mental health diagnosis had significantly improved; both minor children experienced significant health issues since Zephyr was awarded primary physical custody; Zephyr made false allegations towards him regarding his mental health with no clear evidence, causing the district court to order supervised parenting time for over a year; and Zephyr's actions since the entry of the decree were suggestive of parental alienation. He further alleged that child support should be modified accordingly.

On October 21, 2020, Ryan filed a third motion to terminate the temporary order and reinstate his parenting time. A hearing on his motion was set for December, but during the course of that hearing it was ultimately consolidated with the modification trial.

(b) Trial

An evidentiary hearing on Ryan's third motion to reinstate his parenting time was heard over 2 days in December 2020. The hearing continued to a third day in January 2021, which was also when the modification action was set to be tried. By stipulation of the parties, the testimony and exhibits presented at the two December hearing dates were consolidated with the trial in January 2021, which took place over the course of 3 days. Over the course of those 5 days in December 2020 and January 2021, several witnesses testified, and numerous exhibits were received into evidence.

Additionally, during trial, Ryan orally moved to withdraw that portion of his amended counterclaim seeking primary custody, leaving the alternate request for joint physical custody with equal parenting time; the motion was granted.

*(i) Dr. Goodman's Testimony*

Dr. Michael Goodman testified that he had been Ryan's psychiatrist since 2017. He diagnosed Ryan with generalized anxiety disorder and attention deficit disorder. Dr. Goodman stated that he was "not able to say that [Ryan] [was] not bipolar nine years ago," and he "cannot dispute a diagnosis made nine years ago," but Dr. Goodman did not currently see evidence of bipolar disorder. Dr. Goodman also testified that Ryan signed a release so that Dr. Goodman could provide information to Zephyr if needed, however, Dr. Goodman never had reason to contact her.

## (ii) Carrie Hillebrandt's Testimony

Carrie Hillebrandt is the licensed independent mental health practitioner who supervised Ryan's therapeutic parenting time with Austin and Luke. Hillebrandt testified that she supervised 53 parenting time sessions since November 11, 2019, 28 of which were conducted via Zoom because of the COVID-19 pandemic. She stated that Ryan was always eager to see the boys and vice versa. There was never a lull in conversations, there were always hugs and kisses, and she never had any concerns. According to Hillebrandt, the goals of the therapeutic visitation had been met, and without a further order specifying new goals, it would be appropriate to liberalize visitation back to normal parenting time.

## (iii) Ryan's Testimony

Ryan, 42 years old, testified that he had been employed at Gallup from 2010 until he was furloughed in April 2020 because of the COVID-19 pandemic; he was later advised that he would not be returning to Gallup. He was currently unemployed and on social security disability and long-term disability (private policy) due to his Huntington's disease diagnosis.

Ryan was currently seeing a psychiatrist and a therapist, and his "best guess" was that he quit taking his bipolar medication in 2016 or 2017.

According to Ryan, Austin started seeing a therapist, Dr. LeaAnn Lape-Brinkman (Dr. Brinkman), in 2011 or 2012, and Ryan and Zephyr took turns taking Austin to his appointments. The last time Ryan saw Dr. Brinkman in person was in 2015 because, in January 2016, Zephyr asked him not to go to Dr. Brinkman's office anymore. Over the years, Ryan either talked to or emailed Dr. Brinkman about his concerns that Zephyr was engaging in parental alienation, that Zephyr was generally neglecting the children and not providing the children proper nutrition, and his belief that Zephyr had an undiagnosed personality disorder.

Ryan believed Zephyr was guilty of parental alienation and expressed his concerns in numerous emails to Austin's therapist, Zephyr's mother, Ryan's mother, and others. At trial, Ryan was asked about the alienating behaviors, and he said he believed that Zephyr was guilty of parental alienation because she took the children to daycare or used babysitters during her parenting time instead of letting Ryan care for the children. Additionally, in the past year, Zephyr did not let Ryan's family see the children unless she was present.

Ryan also believed Zephyr was negligent regarding the children. He noted that Austin broke his arm/wrist four4 times, once before the divorce, and three times after the divorce; after the divorce, it was once playing basketball in 2017 or 2018, then once when he fell at school, and finally once when he fell while jogging with Ryan. As a result, Ryan expressed his concern to Zephyr about the children's calcium absorption in several messages over the years. He also did not believe the children received a balanced diet when they were with Zephyr, a concern he expressed in repeated emails and other messages to Zephyr over the years, especially when Austin's weight increased over a short period of time. Ryan expressed these same concerns in numerous emails to Austin's therapist and Zephyr's mother, as well as in an email to Zephyr's sister.

Ryan stated that pursuant to the 2013 divorce decree, the communication protocol between the parties was to address one topic per email, and if one of the parties said to stop, "you're done addressing that." He followed the protocol for "a year, two years, three years," "[a]nd then Zephyr

said that it was not necessary" and that he could number his questions in one email, and she would respond accordingly. At that point, he started emailing more and for a while the longer form of communication was going okay. However, around 2017, Zephyr began to not address all his questions or concerns; "I would have to follow up two, three, four times, and I still would not receive a return message or . . . she may answer one out of three questions that are on the email." Then in 2018, there was more conflict. When Zephyr did not respond to emails, Ryan began reaching out to her extended family members.

Ryan acknowledged that he has "some obsessive tendencies," and said he "made the mistake of writing long emails and [he] should've just taken it directly to court." Examples of Ryan's emails sent to various people were received into evidence. One of the emails to Dr. Brinkman was several pages long. The district court had previously ordered him not to contact the children's medical professionals unless it was an emergency, yet he sent Dr. Brinkman a lengthy "emergency" email about his twins (with another woman) and then went on to address numerous topics related to Zephyr and the boys that were clearly nonemergent. He stated he was now trying to call and text people less and trying to keep it to one or two topics at a time. Ryan did not believe that he obsessed about any issue related to his children. He said, "I just feel like there's reason behind it and, like I said, I should've just not -- I went about it the wrong way and I sent -- I shouldn't have sent emails; I should've went about it a different way."

Ryan became frustrated with Dr. Brinkman because "she never really asked me any more questions about things that were extremely concerning that I told her." Ryan "feels helpless" because Dr. Brinkman "hasn't responded to me very much or she hasn't really listened to me." Ryan was no longer comfortable with Austin continuing to see Dr. Brinkman and preferred Austin see a different therapist. Ryan acknowledged filing a discrimination claim against Dr. Brinkman with the Justice Department 2 or 3 months prior to the current trial.

Ryan denied disparaging Zephyr to their children's providers. However, Ryan acknowledged making representations to Dr. Brinkman and others that Zephyr was violent towards him and that she had a personability disorder, claims he also made about the mother of his twins.

When asked why he believed Zephyr was not providing proper parental care for the children, Ryan responded, "[G]osh, . . . there's a lot of them." When asked if there was something that she was not doing to provide care for the children, other than what was already talked about, Ryan responded,

> I mean, there's just a lot of things that are extremely hard to explain. But, you know, I think I had mentioned she missed two Mother's Days [because she was working] and I told her the kids were crying. Austin was crying because he wanted to take flowers to her and she wouldn't let him. She -- and that's just kind of indicative of what it's like, in general, so it's not just big things; it's little things.

Ryan said, "[I]t goes to her lack of nurturing with the kids," and "[s]he doesn't necessarily have a real strong relationship with them." Ryan also mentioned that Zephyr did not take the children to church, she had bad knees and could not do a lot of activities with the boys, she let them use electronics too much, and she was not flexible about seeing Ryan's family.

Ryan stated that he had "a very strong bond" with Austin and Luke. Ryan wanted joint physical custody with equal parenting time. Ryan's parenting time under the divorce decree was

every other weekend from Friday to Monday, and every Wednesday overnight; he now wanted to have every Thursday overnight as well, or at least every other Thursday overnight. He was not asking for a change in legal custody, that would remain with Zephyr. Ryan acknowledged that how Zephyr parents in her household is her business and he would do better respecting those boundaries going forward.

As to a material change in circumstances since the decree, Ryan pointed to his Huntington's disease diagnosis. He is now "home 24/7" and has "very good flexibility." He can pick the children up anytime and can take them during the day. Additionally, because of his disease, his life span "may not be forever" and he would prefer to have the children with him instead of afterschool care or with babysitters. Ryan also wanted Austin and Luke to be able to foster a relationship with their half-siblings.

### (iv) Dr. Kumar's Testimony

Dr. Rajeev Kumar testified that he is a neurologist and had been caring for Ryan since 2019. Dr. Kumar stated that Ryan had early Huntington's disease. Dr. Kumar first saw Ryan in mid-2019 to evaluate his potential participation in an investigational study to treat Huntington's disease and hopefully slow the progression of the nerve degenerative illness. Dr. Kumar had seen Ryan every 2 months since then for ongoing clinical care in addition to treatment as part of the investigational protocol. Dr. Kumar stated that Ryan "has slightly worsened since we first saw him; not surprising." Ryan "is still functioning very well," and "has very minor cognitive impairment." Dr. Kumar stated that Ryan is "very capable of making appropriate decisions and has very close-to-normal memory with very minimal abnormalities." According to Dr. Kumar, "[M]ost patients like this, who have very early disease, continue to function very, very well and independently, at this stage, for at least the next three or four years." Dr. Kumar stated, "In the next five years, I would expect that [Ryan] will develop more disability, both physically and cognitively. . . . [B]ut the progressions is going to be very slow and can be easily monitored to assess his ongoing capacity to do those tasks."

### (v) Sharon Van Dyke's Testimony

Sharon Van Dyke, Ryan's mother, testified that she spent time with Ryan and the boys once a week. Sharon said that Ryan was "an amazing father and he has always put the boys first." She had never heard Ryan say a disparaging comment about Zephyr. Sharon said, "Ryan has always told us, 'I don't want anybody to say anything bad, even if you don't agree with what she's doing, because I don't want to put the boys in that position and hurt them.'" Sharon had not heard Ryan say anything negative to the boys about their weight or appearance, "He's always wanted them to be self-confident and, no, he would never do that."

### (vi) Zephyr's Testimony

Zephyr, 43 years old, testified that she worked as a cytotechnologist at Nebraska Medicine. She typically worked Monday through Friday, 8 a.m. to 5 p.m. Austin, 13 years old, and Luke, 10 years old, resided with her. Zephyr was not aware of any changes in circumstances in her household since the decree. Zephyr stated that the children were "very good students" and never had behavior problems in school. The boys were also involved in various extracurricular activities

prior to the COVID-19 pandemic. According to Zephyr, both boys were in good physical health. Austin had broken his left arm three times since the divorce, but she had not received any indication that he was suffering from any sort of abnormality or deficiency.

Zephyr believed that Austin still needed to see a therapist, not only because of contention in the family, but also because he had anxiety; additionally, he would eventually learn about Ryan's Huntington's disease and would need support. Zephyr wanted Austin to continue seeing Dr. Brinkman. Zephyr was concerned when she learned that Dr. Brinkman may not feel comfortable or willing to continue to serve as Austin's therapist, and it was the primary reason why Zephyr felt she needed to file the current complaint for modification.

According to Zephyr, her situation with Ryan began to deteriorate and became more problematic around 2015. She said Austin took a season off from soccer and "gained just a little bit of weight" and Ryan "became very, very concerned" and "started obsessing about what they were eating." Zephyr would feed the boys before they went to Ryan's house; on one occasion, she gave Austin a granola bar to take with him and as soon as he got in the car Ryan grabbed it from him. Austin was "getting so anxious about things" that they talked to a psychiatrist in Dr. Brinkman's office.

Zephyr allowed regular communication emails rather than multiple one-topic emails because she did not want to receive 20 emails a day about different things. However, even when Ryan sent one email with numbered topics, he "wouldn't stay on one topic per number." Zephyr found it "[a] little bit" difficult to respond to Ryan's emails because his emails were "accusatory, inflammatory," sometimes "ranting." She often had to think about how to respond because she did not want to "inflame him more." When asked if there were common themes in his emails to which she chose not to respond, Zephyr replied, "Calcium; video games; activity, what he thought I needed to put them in; pretty much, whatever it was at the time, he didn't think I was doing right." She had no problem with him asking questions, but "[i]t will always become a bigger issue no matter what." Zephyr said, "I'm not going to say that I never responded to him; but, if he was going on and on about the same subjects, there was probably a good chance I might not be responding to those." When asked if she would characterize what she had experienced as obsessive, Zephyr said, "Yes."

According to Zephyr, even if Ryan did not suffer from bipolar disorder, his behaviors were problematic. She did not believe that it was in the children's best interest to award the parties' joint physical custody or to give Ryan the additional parenting time he requested. Zephyr wanted to maintain legal and physical custody of the boys, with Ryan's parenting time being restored to what it was under the decree following the transition schedule recommended by Dr. Cottam.

*(vii) Rowe's Testimony*

Michelle Rowe testified that she was in an on-and-off relationship with Ryan from 2015 to sometime prior to July 2019. They have twin girls who were born in early 2020. Pursuant to a temporary order, Rowe had sole legal and physical custody of the girls, and Ryan had supervised visits 3 days each week, with a fourth day to be added the following month.

Rowe testified that while she was pregnant, Ryan had been constantly calling, texting, and emailing her even though they were no longer in a relationship, and he repeatedly showed up at her house and place of employment. Rowe said that Ryan would talk about the same things and

would not "drop the topics," and it was never an emergency; "any topic that he thinks is relevant, he will take it to the nth degree." He would "not take no for an answer" and would tell Rowe that she needed him and that she "'was dumb for not trying to make it work.'" Rowe said that instead of encouraging her, Ryan "would just talk about how [she] wouldn't be able to handle it," "[she] would be overwhelmed," and "[she] couldn't do it without him."

Rowe stated that Ryan's behaviors continued after their girls were born. He repeatedly texted and emailed, "[i]t's not just one message of saying this, that, or the other; it's continuous, non-stop." Ryan came to her home to visit the girls, would not leave, and then he got "on his rant about things that don't even make sense." Additionally, Ryan started repeatedly emailing Rowe's family members, writing "lengthy, ranting emails" berating Rowe, claiming she was a violent person, and stating that "he" had diagnosed Rowe with several mental illnesses.

### (viii) Dr. Cottam's Testimony

Dr. Glenda Cottam, a psychologist, performed a psychological and custody evaluation in this case wherein she individually interviewed the parties' and their children. In her reports, she noted that Austin and Luke, who were currently having supervised therapeutic visits with Ryan, expressed a desire to have more contact with Ryan. Dr. Cottam stated that Ryan did not appear to be an unfit parent, nor did he exhibit any current physical or mental illness that would prevent him from being able to parent his children. She recommended a transition schedule toward the parenting schedule in the decree. At trial she testified that the transition could be accomplished by April 1, 2021, if not sooner. She testified that she was not recommending joint legal custody because of the communication difficulties between the parties. Nor was she recommending joint physical custody because it was more important for the children to have quality time with Ryan rather than quantity time. When asked if she would be inclined to recommend giving Ryan an additional overnight every other week, Dr. Cottam responded, "I think that there are so many changes and so many variables and stressors -- so many unknowns with [Ryan] having . . . two very young children that he's also taking care of, with [Ryan] being considered disabled at this point, so his condition has progressed to that level, . . . I just don't think it's in the [sic] best interest to add too much more time . . . even an extra overnight or an extra day. . . . I think it's too much, too fast[.]"

### (c) Stipulations

As noted in the district court's order, during the course of trial the parties stipulated to the following:

a. [Ryan] agreed to withdraw his Complaint against Dr. Brinkman and make all reasonable efforts to do so;

b. [Ryan] will continue to sign releases for Dr. Goodman and other medical providers, pursuant to the terms of the Decree to notify [Zephyr] as set forth in VII (d);

c. [Ryan] withdrew his demand for primary legal and physical custody and was not seeking joint legal custody;

d. [Ryan] agreed he will not contact [Zephyr] on any issue unless she requests him to do so, other than the logistics of exchanging the minor children and shall use the Our Family Wizard application for all communication;

e. The parties stipulated to a "phased in" unsupervised parenting transition, as recommended by Dr. Cottam, with the objective of reverting to the parenting schedule in the Decree of Dissolution. The transition schedule would be as recommended by Dr. Cottam [and attached in an exhibit to the decree];

f. [Ryan] stipulated to [Zephyr's] proposed vacation notification provision;

g. [Ryan] stipulated that Dr. Brinkman shall remain Austin's therapist and he will not contact Dr. Brinkman unless there exists an emergency;

h. The parties stipulated that [Zephyr] shall request the children's therapist to provide [Ryan] updates regarding how the children are progressing in therapy. . . .; and

i. [Ryan] stipulated he will have the minor children take medication as prescribed.

### (d) District Court's Order of Modification

In its order filed on September 1, 2021, the district court found that there had been a material and substantial change in circumstance unanticipated by the parties since the entry of the decree as it related to specified portions of Zephyr's complaint. Specifically, the court found that since the entry of the decree, Ryan had been focusing on certain issues regarding the children's health and well-being and repeatedly expressed those obsessive thoughts to Zephyr, the children's therapist, and others via emails. Ryan engaged in a pattern of obsessively emailing and texting Zephyr. Ryan was clearly disparaging Zephyr to medical professionals. Dr. Brinkman, who had been providing long standing care to the parties' eldest child, was at the commencement of the case threatening to cease her services as the child's therapist because of Ryan's behaviors as related to the services she was providing to the child. Ryan refused to sign releases so that his mental health providers could notify Zephyr if, at any time, certain issues arose during their treatment. The court found there was now a reason for Ryan to sign those same releases with respect to the physicians treating him for his Huntington's diagnosis.

With respect to Ryan's amended counterclaim, the district court made the following findings. Despite Ryan's claim that his mental health diagnosis had significantly improved, he was "displaying similar obsessive and compulsive behaviors as had been the case prior to the entry of the Decree," and that behavior was displayed towards Zephyr, the child's therapist, and Rowe. Dr. Cottam was unable to provide a mental health diagnosis for Ryan, but "testified that some of [his] behaviors could be considered just bad behavior as opposed to a mental health diagnosis." Regardless, Dr. Cottam testified that Ryan should have a relationship with the children and that it would not be in their best interests to reduce Ryan's parenting time. The court was uncertain of Ryan's current diagnosis but said that "the current diagnosis is not as relevant as the obsessive/compulsive behaviors [Ryan] has been exhibiting which have been reflected, in part, in the complaints he has filed with various agencies, extensive emails and calling of extended family and/or employers of [Zephyr]." The court found that Zephyr was not negligent or in any way responsible for the parties' child breaking his arm and there was no evidence to support the allegation that she alienated the children from Ryan. The court "cannot find, based upon the medical testimony that [Ryan's] lifespan has been shortened by virtue of his [Huntington's] diagnosis nor that his cognitive functioning will decrease in the next five years, while at least one of the children is a minor"; "[t]he fact that [Ryan] hadn't been diagnosed with Huntington's disease

at the time of the entry of the Decree was unknown but it's not enough evidence to support a change in custody as requested by [Ryan]." The court found that Ryan's unemployment and alleged additional free time was speculative, given the supervised parenting time schedule with his twin daughters, and there was no evidence to suggest that it would be in the boys' best interests to change custody.

The district court ordered that Zephyr would maintain legal and physical custody of the children. Additionally, the parties would exercise the same parenting time as originally set forth in the decree "once the transition, as monitored pursuant to the stipulation of the parties by Dr. Cottam, would allow for such transition, in the quickest way possible." The court ordered that Ryan was not to contact Dr. Brinkman unless it was a medical emergency, and that Dr. Brinkman should provide Ryan with monthly updates. Ryan was not to be prohibited from communicating with any other medical professionals working with the children. Ryan was ordered to provide the children their medication as prescribed by their physicians and treating medical professionals. And Ryan was to continue to sign releases, as set forth in the decree, to allow Zephyr to receive updates from his medical providers, including mental health providers and those treating his Huntington's disease. Neither party was to disparage the other to the children nor allow any other third party to disparage the other parent in the presence of the children. The parties were to continue to utilize "Our Family Wizard" or any other mutually agreed parenting app to communicate. The court revised the summer parenting section of the parenting plan regarding the selection of the 2 weeks' uninterrupted parenting time. Additionally, Ryan was ordered to pay child support of $766 per month for the two children.

Ryan appeals.

## III. ASSIGNMENTS OF ERROR

Ryan assigns that the district court erred when it (1) failed to disqualify itself and failed to timely disclose on the record its potential conflict of interest with Dr. Brinkman, (2) made findings of fact not supported by the evidence presented at trial, and (3) found that Ryan failed to prove a material change in circumstances showing that the best interests of the children required an increase in his regular parenting time schedule.

## IV. STANDARD OF REVIEW

A motion requesting a judge to recuse himself or herself on the ground of bias or prejudice is addressed to the discretion of the judge, and an order overruling such a motion will be affirmed on appeal unless the record establishes bias or prejudice as a matter of law. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020).

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

## V. ANALYSIS

### 1. RECUSAL FOR CONFLICT OF INTEREST

Ryan argues that the district court judge failed to timely disclose on the record her potential conflict of interest due to the judge's past association with Dr. Brinkman, who several years earlier had served as a therapist for two of the judge's family members. Ryan contends that the judge should have disqualified herself from the case before ruling on the temporary order motion in October 2019. Ryan claims that the judge's first disclosure on the record of her potential conflict with Dr. Brinkman took place 16 months after the temporary order was entered. We note that Ryan did not file a motion for the district court judge to recuse herself at the time of the disclosure.

### (a) Dr. Brinkman's Affidavits

Dr. Brinkman did not testify at trial. However, during this case, she submitted three affidavits pertaining to her therapy with Austin and her contacts with Ryan. The affidavits coincided with Zephyr's motion for a temporary order to have Ryan's parenting time be supervised, and the hearings on Ryan's subsequent motions to terminate the temporary order and reinstate his parenting time. The first affidavit was dated September 26, 2019, and attached her letter dated August 13, 2019. The second affidavit was dated December 12, 2019, and attached her letter dated December 10, 2019. The third affidavit was dated April 6, 2020, and attached her letter dated that same day.

The letter attached to Dr. Brinkman's September 2019 affidavit set forth a number of concerns, including that: Austin suffered from anxiety; Ryan told Austin not to discuss his grandfather's Huntington's disease diagnosis or the nature of the disease, but it was clear that Austin had questions and clearly knew about the seriousness of the disease as well as the hereditary nature; Ryan was angry with Dr. Brinkman for discussing the disease with Austin; even though she had not seen Ryan in more than 3 years, she received several long emails from him that were very critical, long, and compulsive in nature; and Ryan's emails and some phone messages felt harassing in nature. Dr. Brinkman stated that due to the issues cited, she had not had any contact with Austin since May 28, 2019, which was concerning because of their longstanding therapeutic relationship and the fact that Austin's history warranted continued treatment; furthermore, Austin needed a safe place to talk about his ideas and concerns. We note that Dr. Brinkman's affidavit and letter did not contain any recommendations regarding custody or parenting time.

The letter attached to Dr. Brinkman's December 2019 affidavit contained an update on Austin's treatment and referenced that Ryan's parenting time was supervised by a therapist; Dr. Brinkman had read the visitation documentation and it was "clear from the documentation that the visits were going well," and that Ryan had some positive parenting skills, which Dr. Brinkman had also observed in the past. Dr. Brinkman stated that she had never personally treated Ryan,

> However, given the information that has been presented to me over the past several years (by observation, email, [Zephyr], and Austin), I believe it may be beneficial for the court to review [Ryan's] ongoing mental health treatment and psychiatric care. Although I believe that [Ryan] has some strong parenting skills, I am concerned that the potential nature of his mental health issues could potentially be harmful to his children's

psychological well-being (if there is no longer oversight of his visits with Austin and Luke).

The letter attached to Dr. Brinkman's April 2020 affidavit gave a brief update on Austin's treatment and contained a similar statement as set forth in the block quote above.

## (b) Disclosure of Conflict and Waiver

In January 2021, at the end of the fourth day of the consolidated hearing and trial, the trial judge's prior association with Dr. Brinkman was revealed on the record. Ryan's counsel brought up "one housekeeping matter that just . . . crossed [his] mind." Counsel stated, "[Zephyr's counsel] . . . a little while ago called me up and said that you had mentioned in another hearing that you were wondering if I knew that you had some sort of association with Dr. Brinkman and he said that you -- he told you that I did not know that and that you may want to disclose that to me"; "I just forgot and I never got around to it, so I was going to ask the Court what that association was." The judge said, "I think part of that conversation with . . . [Zephyr's counsel] is that [Ryan's] previous counsel knew about it and had waived the conflict." The judge then stated that Dr. Brinkman was a therapist for two of the judge's family members several years ago. After discussion among parties' counsel, Ryan's counsel acknowledged that Zephyr's counsel reminded him about the issue "sometime in November [2020]." Upon questioning by Ryan's counsel, the judge denied that her prior relationship with Dr. Brinkman provided a bias in favor of Dr. Brinkman; the judge said, "[O]therwise, I would have recused myself."

When trial resumed on the fifth day, the judge stated:

> So, at the conclusion of the last hearing, I had emailed counsel that the court reporter went back to see if there was anything placed on the record about the prior relationship that [my family members] had with Dr. Brinkman over five years ago; . . . we could not find anything that was officially on the record, so I emailed both counsel and would like to have any argument or positions on that potential conflict placed on the record at this time.

Zephyr's counsel stated that he discussed the issue with Zephyr "last year" when he was first made aware of the connection, and discussed it again after the fourth day of trial and that Zephyr did not believe it posed a conflict. Zephyr then personally stated on the record that she had "no objection," and she "waive[d]" any potential conflict.

Ryan's counsel stated that he discussed the conflict with Ryan and said:

> I will represent to the Court that [Ryan] does have some significant reservations; but, after 16 months and spending $50,000, the alternative of the case being transferred to a new judge and potentially having another five days of trial . . . he has elected to waive that conflict and understands the legal implications of waiving that conflict of interest.

Ryan's counsel once again stated that he was informed in November 2020 by Zephyr's counsel of "some conflict that had been disclosed early on in the case." Ryan then personally acknowledged to the judge that he was waiving any potential conflict of interest the judge may have.

(c) Legal Analysis

Ryan cites to Neb. Rev. Code of Judicial Conduct § 5-302.11 which states:

(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality* might reasonable be questioned, including but not limited to the following circumstances:

(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge* of facts that are in dispute in the proceeding.

Ryan further cites to § 5-302.11(C) which states:

A judge subject to disqualification under this Rule, other than for bias or prejudice under paragraph (A)(1), may disclose on the record the basis of the judge's disqualification and may ask the parties and their lawyers to consider, outside the presence of the judge and court personnel, whether to waive disqualification. If, following the disclosure, the parties and lawyers agree, without participation by the judge or court personnel, that the judge should not be disqualified, the judge may participate in the proceeding. The agreement shall be incorporated into a permanent record of the proceeding.

Ryan claims that pursuant to § 5-302.11(C), disqualification of a judge under § 5-302.11(A)(1) is not subject to waiver by litigants. We disagree.

Section 5-302.11(C) allows for waiver of disqualification unless the disqualification is for bias or prejudice under § 5-302.11(A)(1), i.e., when the judge has a personal bias or prejudice concerning a party or a party's lawyer. That is not the situation here. Ryan claims that the judge's "personal knowledge of Dr. Brinkman's credibility was not subject to Ryan's waiver." Reply brief for appellant at 11. However, the portion of § 5-302.11(A)(1) addressing a judge's personal knowledge of facts that are in dispute in the proceeding is waivable. Regardless, the fact that two of the judge's family members were treated by Dr. Brinkman several years ago does not constitute the judge's personal knowledge of facts that are in dispute in the proceeding.

A judge should recuse himself or herself when a litigant demonstrates that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown. *Tilson v. Tilson*, 307 Neb. 275, 292–93, 948 N.W.2d 768, 783 (2020). Such instances in which the judge's impartiality might reasonably be questioned specifically include where the judge has a personal bias or prejudice concerning a party or a party's lawyer. *Id.* A party alleging that a judge acted with bias or prejudice bears a heavy burden of overcoming the presumption of judicial impartiality. *Id.* Ryan has not satisfied this burden. Dr. Brinkman did not testify at trial and her only affidavit that predated the district court's temporary order merely stated Dr. Brinkman's concerns and did not contain any recommendations regarding Ryan's parenting time or custody. Additionally, there is no indication in the court's temporary order that it relied heavily on Dr. Brinkman's affidavit.

As to Ryan's claim that his waiver was made under duress, we are not persuaded. His current counsel knew of "some conflict" in November 2020, and Ryan's previous counsel may have been aware much earlier. See, e.g., *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011) (to be voidable because of duress, agreement must not only be

- 14 -

obtained by means of pressure brought to bear, but agreement itself must be unjust, unconscionable, or illegal).

For the reasons stated above, we find no error by the trial court judge's decision not to disqualify herself from the proceedings. Additionally, assuming we concluded otherwise, the remedy would be to return this case for a new trial, and according to Ryan's counsel at the time of trial, after talking the issue over with Ryan and considering it had been "16 months and spending $50,000," and with "the alternative of the case being transferred to a new judge and potentially having another five days of trial," Ryan's preference was to waive the conflict. Other than not receiving his desired outcome, the circumstances have not changed. Further, even if Ryan had formally filed a motion to recuse and had not waived the alleged conflict, this record would not establish bias or prejudice as a matter of law. See *State v. Buttercase*, 296 Neb. 304, 893 N.W.2d 430 (2017) (motion requesting judge to recuse himself or herself on ground of bias or prejudice is addressed to discretion of judge, and order overruling such motion will be affirmed on appeal unless record establishes bias or prejudice as matter of law).

## 2. FINDINGS OF FACT

Ryan claims that the district court erred when it made findings of fact that were not supported by the evidence presented at trial. Specifically he points to the court's findings that (1) "the evidence at trial demonstrates a material change of circumstance as Ryan's obsessive/compulsive behaviors have resurfaced because he is no longer in therapy nor taking proper medication as required by the Decree," (2) "that Ryan had refused to sign releases for his mental health providers, as required by the Decree," and (3) that Dr. Cottam was unable to provide a mental health diagnosis for Ryan." Brief for appellant at 29.

We agree with Ryan that nothing in the evidentiary record specifically states that Ryan's behaviors resurfaced because he is no longer in therapy nor taking medication. Nevertheless, there is evidence in the record to show that his "obsessive/compulsive" behaviors have resurfaced, for whatever reason; and it is those behaviors, not necessarily the reason for the behaviors, that is a concern.

As to Ryan's failure to sign releases for his mental health providers, it was not completely clear whether Ryan always signed a release, or whether he sometimes just showed his providers the provision in the decree requiring him to sign releases. However, at least one of Ryan's providers testified that Ryan did sign the release, but the provider never had a reason to contact Zephyr.

Finally, as to Dr. Cottam's diagnosis of Ryan, in her psychological report for him she wrote:

> Regarding diagnostic impression, at this point in time, [Ryan] appears to exhibit Generalized Anxiety Disorder . . . , Depression (not otherwise specified), and, by history, an attention deficit (ADD) disorder. Today's assessment did not fully support Bipolar I or Bipolar II disorder as currently being a concern but, by [Ryan's] self-report and the review of records, some years ago, he was thought to be exhibiting a type of bipolar condition (possibly, Bipolar I). Based on numerous emails . . . , [Ryan] does appear to exhibit obsessive thought times [sic] but does not seem to fully meet criteria for an Obsessive

Compulsive Disorder. There appeared to be the possibility of some dysfunctional personality features[.]

Thus, Dr. Cottam did diagnose Ryan with generalized anxiety disorder, depression, and attention deficit disorder. However, she was not currently concerned about a bipolar disorder and did not make a definitive diagnosis of an obsessive compulsive disorder or a dysfunctional personality feature.

Although we have clarified any issues with the district court's findings, none of the alleged problematic findings noted by Ryan changes the outcome of this appeal.

### 3. NO MODIFICATION OF PARENTING TIME

Ryan claims that the district court erred when it found he failed to prove a material change in circumstances showing that the best interests of the children require an increase in his regular parenting time schedule. By the conclusion of the modification trial, Ryan was seeking the same parenting time that he had under the original decree, plus every, or at least every other, Thursday overnight.

Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Modifying a custody or parenting time order requires two steps of proof. *Id.* First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.* See, also, Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) (best interest factors to be considered by court in determining custody and parenting time arrangements); *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020) (other factors to be considered).

Ryan argues that he presented evidence of material changes in circumstance occurring since the entry of the decree including

that his mental health diagnosis has improved, that he is actively engaged in mental health treatment to include counseling and medication, that he has been diagnosed with Huntington's Disease, a fatal disease, and that due to his condition, [he] is no longer employed and thus has more time to spend with the minor children[.]

Brief for appellant at 32.

At trial, there was a lot of focus on whether or not Ryan was actually bipolar. However, whether Ryan still has a bipolar diagnosis is not dispositive. The district court heard testimony from Zephyr, Rowe, and even Ryan himself about his "obsessive tendencies." In her testimony, Zephyr detailed how Ryan continued to contact her family members about her and that it had been a problem. There was also evidence that Ryan made derogatory statements about Zephyr to the children's medical professionals, telling one such professional that Zephyr suffered from a personality disorder and was manipulative. The district court determined that Ryan continued to display similar obsessive and compulsive behaviors as had been the case prior to the entry of the decree and that behavior was displayed towards Zephyr, Austin's therapist, and Rowe.

- 16 -

The district court also found that while Ryan's Huntington's diagnosis was new since the entry of the decree, it was not enough to support a change is custody; any additional free time Ryan would have was speculative because of his supervised visitation schedule with his twin daughters. We further note that there is nothing in the record, other than counsel's statements, to show that Ryan's lifespan is shortened because of his diagnosis. Moreover, Dr. Kumar testified that most patients like Ryan, who have very early disease, continue to function very well for at least 3 to 4 years, and that in the next 5 years, Dr. Kumar expected Ryan to develop more disability but that the progression would be very slow.

The district relied on Dr. Cottam's statement that it would be in the children's best interest to have a relationship with both parents, and that she recommended a transitional schedule with the goal that Ryan return to the same parenting schedule as referenced in the decree. We note that Dr. Cottam, Ryan's own expert, was asked if she would be inclined to recommend giving Ryan an additional overnight every other week, and she responded that she "[did not] think it's in the [sic] best interest to add too much more time . . . even an extra overnight or an extra day." There is no doubt that Ryan loves his children and that they love him, and that they have a great relationship with one another. However, we cannot say that the district court abused its discretion when it did not modify the decree to increase Ryan's parenting time.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's September 1, 2021, order of modification.

AFFIRMED.